Adm'r of SPENCE *versus* WHITAKER ot al.

QUESTIONS IN THIS CASE.

*Relative to the assignability of stock certificates, and
of off-sets thereto.*

*As to sales to a trustee, of the trust estate*

*Compensation to an acting trustee.*

1. Certificates of stock, issued by a private association, under articles rendering them assignable, and prescribing no lien upon them, for debts due the company, are not subject, in the hands of a *bona fide* assignee, to an off-set against the original stock-holder.

2. A sale to a trustee of the trust property, by one having interest therein, induced by a want of information as to the value of the article sold, and which is within the knowledge of the vendee, but not disclosed by him at the time, is fraudulent and void.

3. So, where the active trustee of an association, having within his own peculiar knowledge and control, the condition of the company transactions, induced the holder of certain certificates, to believe that they were of little value, whereby a sale was made of part of them, to the trustee—it was held, that the sale was fraudulent, void and of non-effect.

4. A stock-holder who acts as the agent and active trustee of a company, is entitled to a reasonable compensation for his personal services, while regulating the business of the association.

This was a Chancery cause in Lawrence Circuit Court.

The bill was filed by Joseph Spence, executor of John Spence, and the suit was revived in the name of Campbell, administrator. The object of the bill was to effect a settlement and account of sundry transactions, in which Whitaker and others had been

3 v. P.                   38

concerned as stokholders and trustees of the Court-land land company.

The bill stated, among other matters not material to be noticed—that a number of individuals, in 1818, having on their joint account purchased certain lands, associated themselves together by articles of agreement, (exhibited as part of the bill,) under the name of the "Courtland Company," and constituted and appointed William H. Whitaker and the other defendants, agents, or trustees, to lay off and sell out a town on said land, for the benefit of the stockholders; that said town was laid off and sold, and the proceeds and interest in said property divided into one hundred and sixty shares, for each of which a certificate issued; that, by the terms of said articles, the certificates were assignable, and the assignee thereof entitled to all the benefits, and subject to all the conditions and penalties to which the original parties thereto were subject and liable. That, one great object of said trustees and others interested, was to force the improvement in said town; and, with that view, the said certificates were exempted from all incumbrances, but those apparent upon their face, in the hands of assignees, that they might obtain a more extensive circulation, and increase the number of individuals interested in the prospects of said town.

It was further charged, that it was understood, by the members of said association, and expressly agreed by them, and the trustees, in their behalf, that such certificates, *bona fide* assigned, should not be bound for any debt against the assignor, but such as were expressly stipulated on their face. That one John M. Tilford, being the owner of nineteen shares of

said stock, did, about the 25th August 1821, deposite them with John Spence, the complainant's testator, as collateral security against a heavy responsibility incurred by him, for said Tilford, and at the same time did, by power of attorney, authorise said John Spence, to sell and transfer the same; that in pursuance of said agreement, thirteen shares of said stock, had since been assigned to Joseph Spence, the executor of said John; that said John Spence had been compelled to pay the sum for which he made himself liable, and that his executor was entitled to all the proceeds and benefits of said shares of stock.

The bill further charged, that after said John Spence became entitled to said certificates, a call was made on the stock-holders, for a payment thereon, agreeably to the articles of association, and that said John attended, with the expectation that there was enough due on the shares, to meet said call, but was informed by said Whitaker, the treasurer and active trustee of said board, that that was not the case, and that no dividends had been declared.— That, thus situated and surprised, he was induced to sell to said Whitaker, six of said shares, to enable him to prevent the forfeiture of the remainder; and that, upon the representation of said Whitaker, that they were of no greater value, he sold them at ninety-three dollars and fifty cents a share.

The bill charged Whitaker with negligence, in not keeping the books, and making an expose of the situation of said business as required by the articles of association; that he had been permitted to manage the business in his own way; and had, by various stratagems, possessed himself of a large portion of the stock; that, by refusing to permit Spence to in-

spect the books, and deceiving him, as to the real situation of the funds, he fraudulently induced him to sell said six shares, at a very small part of their real value, and purchased them with the money of the company. That the said Whitaker claimed six shares in his individual right, and refuses to account for dividends upon the thirteen shares, until the complainant paid and satisfied a debt due said company, from said John M. Tilford, for lots purchased by him in said town of Courtland.

The complainant insisted, that he held said thirteen certificates, exempt from said discount; and, at all events, that, if they were liable, the six shares which Whitaker bought of him, were likewise liable; but claimed that none were subject to this set-off.—He urged, that Whitaker, having purchased the six shares of him, at an under value, and with Spence's own funds, held them in trust for them; and therefore, he prayed that the defendants be decreed to account with, and pay over to him, in proportion as thirteen is to one hundred and sixty; and that the six shares transferred to Whitaker, be surrendered to him, or the amount which said Whitaker's shares would be entitled to draw, be decreed to him, out of the amount due said Whitaker.

In his answer, Whitaker admitted the purchase of the land—the laying off the town—sale of the lots—and the division of the stock into one hundred and sixty shares; nineteen of which were issued to John M. Tilford. He stated the amount paid on each certificate, and the subsequent calls to which they were liable. He urged the exclusion of all parol understandings and agreements, as if the same had been plead, and insisted upon the written contract

(which he said was plain and unambiguous,) with reference to the existing laws, as the only legitimate mode of ascertaining the true meaning of the parties: but, proceeding further to answer, he denied that there was any understanding that, to build up the town and force improvements, the certificates should be held by assignees, free from incumbrances; and, expressly said, that, though he was one of the leading members of the company, he never made any such agreement. As to his private opinion, he did not recollect, that, at the formation of the company, he thought on the subject at all; since then, however, he admitted, that having derived his impression on such subjects, from the laws of Tennessee, where he had previously lived, and where the law-merchant prevailed, he might have thought that the certificates would go into the hands of an assignee, free from liability to the debts of the assignor; but, that acting for others, he was bound to consult counsel, who advised him, that by the articles of association, the assignee would stand in the same situation with the assignor. He then set forth the purchase of lots by Tilford, to the amount of five thousand four hundred and thirty dollars—admitted the transfer of the certificates, and said that at the time of this transfer, Tilford also sold to Spence the lots he had purchased. He admitted the duty of the trustees to make an annual report of the dividends; but said, that an unexampled pressure for money, together with the inability of the trustees to make titles, prevented purchasers from paying for the lots, and of course there were no dividends to declare. He then related the manner in which the trustees, with the consent of those holding a majority of the stock, avail-

302

CASES DETERMINED

ADM'R OF SPENCE vs. WHITAKER, et al.

ed themselves of the provisions of the relief law of 1821, which resulted in a call upon the stock-holders for forty-seven dollars, upon each certificate.—— Then, for the first time, he learned that the complainant's testator was the owner of Tilford's stock, and that he then told him, that the trustees would hold said stock liable for Tilford's debts. He said, that it was at the solicitation of John Spence, that he purchased the six shares of stock, and to enable him to pay the instalment on twelve of the remaining shares; that for the six shares, he gave five hundred and fifty-four dollars and sixty-four cents, or about ninety-two dollars and ninety-four cents a share, which he alleged, was about the rate at which stock had first been sold in the town of Courtland, after having been duly advertised. He said that one remaining share was offered to him, by Spence, at fifty-dollars; but, fearing that the stock retained would not be sufficient to pay Tilford's debt, he refused to buy. He alleged positively, that he paid for said six shares, out of his own individual funds; and said, that he had then collected but twenty two dollars and fifty cents of the company's money; and had paid for them, of his own funds, two or three hundred dollars. He also denied withholding information from the complainant's testator, and therefore claimed six shares in his own right. He stated the death and removal of several of the trustees—several matters calculated to darken the prospects of the company—the great exertions of himself and one Perrine, to prevent losses, and secure advantages; without which he insisted that the stock would have been far less valuable. He alleged the extension of credit on the lots, the reduction of the amount of

sales, one fifth, by the operations of the relief law, which, together with the pressure of the times, and the doubtful situation of many of the debtors, indú-ced the trustees to forbear sueing : but said that he vigilantly employed the interval in getting new securities—the lots having so fallen in value, as to furnish but slender guarantees, and by his active exertions to secure debts, that would otherwise have been lost, many of them were secured. He then stated a meeting of the board, in 1826, their proceedings, &c. and exhibited certain vouchers, as showed most satisfactorily what he did, and the situation of the business. Said that all the certificates had been taken in, except those of the complainant, and others similarly situated. He admitted his refusal to settle with the complainant for said shares of stock unless he would pay, or make a deduction for said debts of John M. Tilford. He alleged that Tilford and Clopper, his security, were both insolvent at the time said certificates were transferred to said complainant's testator.

Complainant's answer (which it was agreed, should be read as a deposition) denied that there was any understanding or agreement, that the certificates should go into the hands of an assignee, free from debts against the assignor ; but said, that he considered the reverse to be the case. In this, Tilford and McKernan, the other defendants, answer differently.

By the second section of the articles of association, it was provided, " that each share shall contribute equally to the payment of said land, and all other expenses of said Company, and shall entitle the own-er thereof to an equal proportion of all profits and pro-

ceeds of this joint stock and property—the payments to be made on each share, &c.; and any share on which any payments shall not be duly made, &c. shall be forfeited for the benefit of the joint stock."

The third section provided, that "certificates for each share shall be issued and numbered."

The fourth also provided, that "said certificates should be assignable, and for evidence of such assignments, then followed these words—"the assignees of the certificates of stock, and the heirs and representatives of stockholders shall respectively be entitled to all the benefits and privileges, and subject to all the penalties and conditions to which the original parties thereto are entitled, and liable."

The certificate, after stating what had been paid, and the number of the certificate, proceeded to provide that John M. Tilford, his assignee or representative should be entitled to all the benefits of the share, upon the production of the certificate, provided the said Tilford, his assignee or representative should well and truly pay the instalments, &c. : and closed with a promise on the part of the trustees to pay to said Tilford, his assignees or representatives, according to the articles of association, all dividends, &c.

A reference having been made to the master ; and most extensive proofs made, an account was taken, by which it was established that the value of the nineteen shares sold to Spence, in 1826, was four hundred and fifteen dollars each, making the sum of seven thousand eight hundred and eighty-five dollars. Against this, the master allowed to be credited against complainant, five hundred dollars, counsel fees in the present suit; and twenty-five hundred dollars, claimed by Whitaker, as compensation as trustee.

ADM'R OF SPENCE *vs.* WHITAKER, et al.

A final decree was rendered on bill, answers, exhibits and testimony, whereby the sum of fifteen hundred dollars were allowed to Whitaker, for his services—five hundred dollars to counsel, as fees: the sale to Whitaker was also decreed valid; and the Chancellor admitted the off-set of the Company's debt, to go against the thirteen shares.

The Reporter has not believed it essential to embarrass and confuse this case, by adverting to more of the facts than are above stated; believing that those set forth are sufficient to put the reader in possession of every item embraced in the opinion.—In fact all the testimony, exceptions, and other items, contained in the *many hundred* pages of this extensive record, have been waded through in research after all the important facts, there contained; and believing that no more are necessary to a history of the cause than those above, none others are submitted.

The case was argued by *Mr. Thornton*, for the plantiff in error; and by *Mr. Ormond*, for the defendant.

It was contended by *Mr. Thornton*—

*First*—That the sale of the six shares to Whitaker, was void. It was a purchase by the trustee, of the trust fund; and if not void for that cause alone, was so in this case, under the circumstances disclosed by the record: and there were cited, the cases of *Lecatt* vs. *Sallee*, see page 115 of this volume; and of *Green* vs. *Winter*, 1 Johnson's Ch. Rep. vol. 1, p. 27; Ib. 394—Ib. vol. 7, p. 257, 258.

*Second*—That the allowance of the set-off, of Tilford's debt, for the purchase of the lots of the company, against the certificates, was illegal and improper.—Aikin's Digest, 328; 3 Dallas, 505, 506; 2 Johnson's Ch. Rep. 156; 3 Ib. 358; 1 Porter, 148.

*Third*—That the allowance to Whitaker was improper.----1 John. Ch. Rep. 27; Ib. 527.

*Fourth*—That the allowance of a counsel's fee was wrong.

*Mr. Omond*, for the defendants.—There are two leading questions in this case, which I will argue seperately.

1. Have the defendants a right to set off the debt due them from Tilford against the complainant's testator, his assignee? I will endeavor to maintain that they have that right upon the statute authorizing assignments.—See Digest, page 328, section 6.

The certificates of stock in this case, are for the payment of money, subject to no other contingency, than the uncertainty of the dividend which might be declared, and suspending the right of action until that time. It is admitted, that this quality would prevent their being negotiable; but negotiability, it is plain, was not in the contemplation of the legislature, as was determined by this Court, in the case of *Smith* vs. *Anderson*, decided at the summer Term, 1831.

The statute of 1807 was, in effect, the statute of Anne, and made such instruments as were assgnable under it, negotiable. That, however, was repealed, and the statute just cited, enacted—the whole object of which manifestly was, to vest the legal title in the assignee, subject to such off-sets and dis-

counts as existed, previous to notice of assignment, against the assignor.

But, it is insisted, that, by the articles of association, which are referred to in the stock, the Courtland company bound themselves not to set up an equity, which they might have against the original stockholder, against the stock, in the hands of the assignee; and the fourth clause of the articles is relied on, for this purpose. That clause makes the stock assignable, and concludes by saying, that "the assignees of stock, and the heirs and legal representatives of stockholders, shall respectively be entitled to all the privileges and benefits, and subject to all the conditions and penalties which the original holder was entitled or subject to." It seems to me, that language cannot well be imagined, stronger than this, to place the assignee in the same condition as the assignor, which is all I am contending for.

The gentleman on the other side, however, supposes, that the association of gentlemen, who were about forming the Courtland company for the purpose of building a town, designed to make the stock, in the hands of an assignee, negotiable, and not subject to the debts of the assignor, contracted with the company, previous to assignment. If this was their design they have been very unfortunate in the use of language. There might be some reason imagined, though none appears on the paper referred to, for giving this quality to the stock, in the hands of an assignee; but what possible motive could exist, for absolving the heir or legal representative of a stockholder from paying the debts of his ancestor, or testator, when they presented the stock, and demanded the dividend due upon it? Such folly

308

CASES DETERMINED

ADM'R OF SPENCE vs. WHITAKER, et al.

as this cannot be imputed to them, without the clearest proof of such an intention. And yet the very clause, and the only one relied on to prove this, is one in which the assignee is coupled with the heir and legal representative. A much more probable supposition is, that the question I am now considering, was not in their contemplation, at all. And the law entering into, and operating on the contract will subject the complainants to the payment of the debt of Tilford.

If I am wrong, in the supposition that this stock was assignable, under the statute, then, unless I am mistaken, as to the import of the fourth clause of the articles before referred to, this is a chose in action at common law; and if so, it it clear, that the assignee takes it subject to all the equity which existed between the original parties. This was determined in the case before referred to, of *Smith* vs. *Anderson*, in which the Court set up a latent equity against Anderson.—For this, also, see the case of *Norton* vs. *Rose*, 2 Washington 233; and *Picket* vs. *Morris* 255, same book; 2 John. Ch. Rep. 441, and 479; 1 Mad. Ch. 544, 7, 8.

This case has been assimilated to a partnership, in which, by the original articles, any partner was allowed to retire and substitute another in his place.— It is admitted that there is some resemblance; but, in such a case, would not the partner coming in, stand in the shoes of his predecessor, and if he owed a debt to the firm, would not the partner so coming in, upon a dissolution, be compelled to allow a debt which his predecessor owed the partnership.

In this case, the debt due by Tilford, was a debt due for the purchase of lots in the town, and was a

part of the very fund out of which the dividend was to be made. It was, if the analogy be good, a debt due the partnership. For the law, in such a case, see 5 John. Ch. Rep. 417.

If the interest in one partner in a firm, were sold under a judgment, for his individual debt, would the purchaser acquire a right to absolution, for any debt such partner might be due the firm?

The other question in this cause is the right of Whitaker to retain the six shares of stock purchased of Spence. The facts of the case, so far as they relate to this point, are briefly these: Tilford was the owner of nineteen shares of stock in the Courtland company, and, being much embarrassed, and owing a large debt to Spence, gave him a power of attorney to sell or dispose of it. The Courtland company, as they had a right to do, made a call on the stockholders to pay an instalment on the stock, to enable them to settle the debt due the government. Spence appeared, in obedience to the call, and refused to pay any money; but proposed to Whitaker, to sell him six of the shares. Whitaker purchased, at a price which paid the call of the company, on twelve of the remaining shares.

It is contended, that this purchase is void, from the fact of Whitaker being one of the trustees.

It is admitted, that in England, and in some of the States of the Union, the law is settled, that if a trustee purchase at his own sale, it will be set aside, at the instance of the *cestui que trust*, without showing any fraud or unfairness in the transaction; and, although the trustee may have given a full price.— But, in this State, the law has been settled differently.

This Court, in a case reported in 2 Stewart 47, decided that a fair purchase by a trustee, at his own sale, would not be disturbed. The rule is also well settled, both in England and the United States, that if the *cestui que trust*, with knowledge of the facts, consent to the purchase by the trustee, or afterwards approve or acquiesce in it, it will not afterwards be set aside.

In this case, the sale was made by the *cestui que trust*, himself, with full knowledge of all the facts, and for what, at that time, was a fair price : and, to permit him to object to it, after the lapse of time, and when circumstances, not then foreseen, have added to the value of the stock, would not only be against the adjudged cases, but contrary to equity and good conscience.

It is not, however, admitted, that the rule applies to such cases as this. The legal title to the stock was not in the trustees, but in the stockholders, who alone had the power to sell. The trustee, in this instance, was merely passive; and the reason of the rule fails when it is applied to a case like this.—*See* 13 *Vesey, jr.* 601, and 1*st Peter's Circuit Court Reports*, 368.

But if this sale be void, for the reason alleged, what right has Spence to complain of it. In 1821, as the agent of Tilford, he sells the shares in question, to Whitaker, and if an injury was done which this Court will redress, it was an injury to Tilford, and not to Spence. who was a mere agent.

There is no allegation in the bill that this right of action has been transferred to him ; nor would it avail any thing if there was. as such a right is not susceptible of assignment or transfer. It will not, I pre-

ADM'R OF SPENCE *vs.* WHITAKER, et al.

sume, be contended that because, afterwards, in 1826, he acquired the legal title to the remaining thirteen shares by assignment—that he thereby acquired a right to be compensated for an injury done to his assignor in a different transaction, and in relation to a different subject, five years previous. Tilford is a mere nominal defendant to this bill : to entitle him to relief he should be complainant. If, therefore, the transaction be void, as to Tilford, there can be no decree, so far as the six shares are concerned, in this action.

SAFFOLD, C. J.—The facts, material to the enquiry, according to the views we have taken of the case, present the following questions—the determination of which is considered sufficiently decisive of the controversy.

1. Was Tilford's debt due the trustees of the Courtland Company, admissible as a *set-off* in their favor, against the executor of John Spence, to whom Tilford had transferred his certificates of stock in the Company ; or was there error in the allowance thereof by the decree of the Circuit Court?

2. What was the effect of the sale of the six certificates of stock to Whitaker, while he acted as trustee and treasurer of the Company—was it *valid* as decreed by the *Chancellor* below, or was it *void* on the ground of either actual or constructive fraud.

3. Was the allowance of one thousand five hundred dollars to Whitaker, for his services as trustee and treasurer, equitably due, and properly allowed?

4. Should the charge of five hundred dollars, as a fee to the *defendant's attorneys*, for defending this suit, have been allowed against the *complainant?*

The elaborate investigation which the subject appears to have received from the Chancelor in the Court below, and the respect I entertain for his opinions, together with the learned and satisfactory argument, of which we have had the benefit in this Court, from the counsel on each side, entitle the case to our mature consideration.

1. The first question proposed for consideration, is important in principle and not free from novelty or difficulty. The true character and legal effect of these stock certificates, in the hands of a *bona fide* assignee, must depend on the law and usage, peculiar to such securities, in conjunction with the articles of association, from which they emanated. It is conceded by all, that they are not of the technical character of any of the instruments, specified in the statute concerning "bonds, notes," &c."  But, it is contended, that they are embraced by the more comprehensive words, of "or other writings, for the payment of money or any other thing;" that, by virtue of this statute, the grantors or makers of the certificates, when sued thereon, by an assignee are entitled to the same matters of defence, which are provided for obligors or payors, in case of assigned bonds or notes—among others, to the benefit of any set-off against the first holder of the certificates.

*Aik. Dig.* 528

It may be useful to speculate a moment, on the consequences of the principle contended for. The same individual might be the first or subsequent holder of many certificates, a separate one having issued for each share. Tilford held nineteen certificates, which he could have assigned to nineteen different persons. Had he held them as assignee, so far as depends upon the articles of association, and the equi-

ty of the lien, they would have been no less charge-
able with his debts, for lots purchased of the compa-
ny. In either case, the assignments by him, might
have been made at as many different times as he had
shares, and there were changes in the amount of
profit or loss on the stock : so that the amount due
thereon, at the time of assignment would have been
different on each several certificate. If the profit
on the stock, be claimed as a set-off, on the ground,
of its being an interest which the debtor has assign-
ed, as in case of a bond, note, &c., the claim can
extend only to so much as had accrued at the time
of the assignment, and interest, damages or, the
like, which would accumulate as a legal consequence:
for no right to any thing more, had ever vested in
the assignor—consequently he could never have as-
signed more. Then, how could the set-off, claimed
against the former holder, be apportioned among the
several assignees?

If the claim be sustained, with reference to the
the value of the stock, when assigned, or any other
time, the assignor proving insolvent, in justice and
equity, it would seem, that each assignee should con-
tribute his proportion in discharge of the lien. If
more has been recovered against one, how is he to
coerce contribution from the others? There is no
privity between them. The fact is also material, in
this view of the subject, that the accruing profits on
the stock, according to the articles were to be
annually paid over to the respective holders of
the certificates : the necessary consequence of which
was, that the right to the dividends, as they periodi-
cally accrued, vested directly in the holders of the

9 v. P.                    40

certificates for the time being; and the assignors, never having had any title to them, they could not be set against their debts.

In these several respects, I think there is an obvious difference between these certificates and any of the instruments, intended to be embraced by the statute referred to, which entitles the maker to the benefit of any payment, discount or set-off, made, had or possessed against the payee or obligee, before notice of the assignment.

Could it be said, that all the profits to arise on this stock, had accrued before the assignment, the fact would be immaterial to the principle. The certificates were equally assignable before, and the supposition, that they were so assigned, demonstrates the objection to the principle. But the fact, that profits subsequently accrued, in this case, may be assumed, in as much as Whitaker the active trustee and treasurer of the company, after the right had been transferrred to Spence, estimated the value of the stock at only about one fifth of its subsequent value.

I recognise the principle, that it is only by statute authority, that the payor of a note, or obligee of a bond, when sued by, and in the name of an assignee, can set-off a demand against the payee or obligee.— Whether the statute of Anne introduced a new principle, by attaching to promissory notes, payable to bearer, negotiable qualities, or whether the statute was, in this respect, only declaratory of the common law; yet, in either view of that mooted question, statute authority is necessary, to enable a defendant, when sued by an assignee, who has a right of action in his own name, to avail himself of a set-off, due from the assignor, or any other, not a party to the

suit. In this respect a set-off stands on a different principle from failure or illegality of consideration, or any other *vice* in the contract. In cases of the latter kind, the defence is available, at common law, in an action by the assignee, if he received the negotiable instrument *after due*, because non-payment at maturity furnishes a ground of suspicion : or if he received the security before due, having actual notice of such ground of defence.

But this right of defence does not, at common law, apply to sets-off, which do not impugn the validity of the instrument sued on. It is true, that an assignee who sues upon a chose in action, which, by law, is not negotiable, or assignable, so as to enable him to sue in his own name, is subject to be set-off, by a debt against the assignor ; but it is so, because the assignor is the plaintiff in the action, and the assignee is only the *cestui que use.* There, the debts are mutual between the plaintiff and defendant.

But, even in such cases, where the defendant obtains the set-off, after notice of the transfer, law, as well as chancery will protect the equitable interest of the assignee, and disallow the set-off against him. I presume it will not be contended, that the assignor of these certificates could, after the assignment, maintain any action upon them, in his own name, either in law or equity.

The case of *Norton* vs. *Rose*,[a] which is supposed by the counsel for the defendants, to be decisive in his favor, is believed to sustain no principle, inconsistent with the views I have advanced. The Court there held, that an assignee of a bond, under the statute of Virginia, though for a valuable consideration, and without notice, took the same, subject to all the equi-

ty of the obligor, against the obligee. In that State a statute exists, similar to ours, authorising the assignee to sue in his own name; but it contains a proviso, that in such cases, the defendant shall have the benefit of all just discounts, which he can prove before notice of such assignment, given to him. The proviso, however, was considered as having no other effect in that case, than to show that the statute did not render the instruments embraced by it, negotiable, by putting them on the footing of inland bills of exchange, as was done by the statute of Anne.— But it was perfectly clear, and so considered by the Court, that the bond, in that case, was of the description of securities contemplated by the statute, and thereby rendered assignable by indorsement, but not negotiable, so as to deny the defendant the benefit of discounts, either legal or equitable, before notice of the assignment.

This latter is the only difficult question on the point now under consideration. It is whether our statute applies to instruments such as these stock certificates. If it were conceded that it does, in all respects, to the same extent with bonds or promissory notes, the claim of set-off could not be resisted. This being the main question, but few of the authorities relied on by the counsel can materially aid our decision; and for this reason they will receive less consideration than they would otherwise require.

The opinion of this Court, in the case of *Smith* vs. *Anderson*, is not in point. The *set-off* there claimed and allowed was against *promissory notes*, in the ordinary form, between individuals, and given for definite sums of money, payable at fixed periods. The matter offered as a set-off, was money actually paid

for the use of the payee in the notes. From this notice alone, it sufficiently appears to be inapplicable to my present enquiry. The question is altogether different, whether certificates of stock in this and similar associations or companies, do not constitute a different class of *securities* or *property*, which whether technically *negotiable* or not, as bills of exchange and the like, are equally exempt in the hands of a *bona fide* subsequent holder, against any claim of set-off against a prior holder.

The decision must materially depend on the terms of the articles of association, under which the certificates issued, and the nature and object thereof. That it was competent for the Company, by their articles, to have retained a lien on the certificates, as well as on the lots sold, to secure the purchase money for the latter, can not be questioned; yet it may be doubted, if they could have done so with good faith, without expressing the lien in the certificates, as they did in the title bonds, or giving it publicity in some other way. The express provision for the lien in the bonds, and none in the certificates, furnishes a strong implication that it was not retained in the latter, or so intended. If it be farther found that the articles have expressly retained the lien on the certificates for other claims or demands, and none for the price of lots to be sold, this will warrant a still stronger inference against its existence in the latter case.

The articles (see 2d,) provide that each share shall contribute equally to the payment of the lands to the general government, and all other *expenses* of the Company, and shall entitle the *owner thereof* (by assignment or otherwise) to an equal proportion of all profits and proceeds of the joint stock. The pay-

ment on each share shall be made on such notice and at such times and places, as the trustees, shall, by their rules, prescribe ; and every share on which any payment shall not be made, when required, shall be forfeited to the Company. (3d )—The trustees shall issue certificates for each share. (4th.)—The certificates shall be assignable, &c. The assignee, and the heirs and representatives of stockholders, shall respectively be entitled to all the privileges and benefits, and subject to all the penalties and conditions, of the original parties.

Much reliance is had on this fourth article, and the argument deduced from it, that it places the *heirs* and *representatives* of the stockholders on the same footing with the *assignee*, and the former cannot be in a better situation than the ancestor, or less liable to the *set-off.* To this it is considered a sufficient answer to say, that the provision requires only that the heirs and representatives of the original stockholder shall be subject to all *his liabilities*, and the heirs and representatives of an assignee subject only to all his ; and in either case, the responsibility shall extend alone to the charges, "expenses" and demands provided for by the articles, as entered into by and between "the original parties;" but that the assignee, his heirs or representatives, or the stock held by the former at the time of his death, should be chargeable with the *price of lots* purchased by the immediate or any remote assignor of the certificate, seems never to have been contemplated by any clause or sentence in the articles.

It would be worthy of consideration, whether, if the stock be subject to *set-off* by the debt of the original assignor, it would not be equally so by the debt

of the last or any intermediate assignor. The lat-
ter would have been no less the "owner" or "hold-
er" of the stock than the former. It surely could
never have been intended to embarrass the stock by
incumbrances of this kind, which must have pre-
vented their circulation.

The eighth article directs, that, after the town
shall have been laid off, the trustees shall sell at
public sale to the highest bidder, at such times, and
"on such terms as they may think proper, the lots
therein," not included in any reservations or dona-
tions they may have made.

The 10th requires the trustees to keep register
books shewing the *state of the funds* of the Company,
the expenditures, debts due to and from the Compa-
ny, and monies in their hands, which book shall, *at
all times*, be open to the inspection of every *stock-
holder*. No right of such inspection is secured to
others who may be about to purchase the stock.

Article 11, directs, that out of the proceeds of sales,
the trustees shall retain what shall be necessary to
pay the "expenditures," which have been made in
the business of the Company, and "the debts be-
coming due from the joint stock, to pay (the govern-
ment) for said lands, or for other purposes, and which
can not be provided for in due time out of other
funds." Here is no recognition of the right to re-
tain proceeds for the payment to the Company for
lots sold, but the contrary is implied.

The 12th article requires, that at least once in
every twelve months, on the first day of November,
annually, the accounts of the Company shall be so
stated as to shew *what is due to each share*, and the
same shall be paid to the "*owner of the certificate*,"

on the production thereof, "unless said certificate shall have been *forfeited* according to these articles." This appears farther to preclude the right to retain or withhold dividends, to be offered as sets-off against the debts of a *former* "owner" of the certificate of stock.

The 14th article provides that the owners of said certificates, whether original holders or assignees, and their representatives respectively, shall be entitled to all actions 'at law and equity for a breach of these articles or any part thereof, as *fully* "as if each of *said owners* were here, by his own proper name made a party to this agreement." Then, as the assignee and his representatives, after assignment, are to be treated and regarded in the same light as if they had been the original holders of the certificates, debts or demands against other individuals, can not be available as sets-off against them.

I have noticed the substance of every provision in the articles which appears to have the least bearing on the question under consideration, and they appear to me to exclude the idea of any lien upon, or right to set-off any portion of the dividends on assigned certificates, in discharge of debts due the Company or their trustees, from *former holders,* for the price of lots purchased by them. This effect and intent I think, are rendered the more evident, from the fact, that the trustees, in the execution of their authority, *to prescribe the terms on which the lots were to be sold,* (see 8th article,) required bonds with personal security, and by their title bonds to purchasers of lots, expressly retained a lien on them, for the payment of the consideration. In these respects, no difference was made between stock-holders and others who be-

ADM'R OF SPENCE *vs.* WHITAKER, et al.

came purchasers; they took the same security from holders of stock as was required from strangers, and we may presume a lien, or right of set-off against the stock was deemed unnecessary. It would seem to have been a rational conclusion, that the purchaser's bond, with security deemed sufficient at the time; together with a lien on the lots, for which the debts were owing, (the lots in most instances being purchased for the purpose of being improved,) would have furnished ample security. That such was the design of the trustees, I can not doubt; but whether it should prove so or not, they have provided no other security. While it must be conceded that the Company, or trustees, had no power to adopt rules which were repugnant to the laws of the land; and that, being incorporated as a body politic, they could act only as an individual, or a voluntary association of individuals; yet they had the undoubted right, in their contracts, to stipulate such terms, and prescribe such rights, forfeitures and conditions, as were not prohibited by law: consequently, they had a right, while adopting the articles for their government, and issuing the certificates for the stock, to have provided a *lien* upon them for debts due the Company from the original or any subsequent stock-holders, and having declined the insertion of any such stipulation, in either instrument, they could not afterwards claim it.

On principles of analogy, the case of *Mandeville* v. *The Union Bank of Georgetown*,[a] may be regarded as a strong authority in this case. In that case, Mandeville had executed a promissory note to C. J. Nourse or order—*negotiable* at the Union Bank of Georgetown—*payable* at the Potomac Bank in Alexandria;

9 Cranch, 9

3 v. P.  41

the same having been made in the county of Alex-
andria. The note was discounted in the Bank in
which it was expressed to be negotiable. When
sued upon it by the Bank, Mandeville offered to set-
off, a note and acceptances of Nourse, of subsequent
date, against his own note, upon which suit was
brought by the Bank as indorsee. In support of the
set-off, it was contended, that as the contract was
subject to the laws of Virginia, which allowed the
defendant to set-off against the assignee of a promis-
sory note, any just claim which he had against the
original payee before notice of the assignment, the
defendant was entitled to the benefit of this defence.
Chief-Justice *Marshall* delivered the opinion of the
Court, and said it was entirely immaterial, whether
the question was governed by the laws of Virginia, or
of Maryland. By neither of them could the discounts
claimed by Mandeville be allowed: that by making
his note negotiable in Bank, he authorised the Bank
to advance on his credit, to the owner of the note,
the sum expressed on its face: that it would be a
fraud on the Bank, to set up off-sets against the note,
in consequence of any transactions between the par-
ties. These off-sets were waived, and could not, af-
ter the note had been discounted, be again set up.

In one respect, at least, the objection to the off-set
in that case, was less forcible than in this, in that the
note against which it was offered, was for the uncon-
ditional payment of a sum certain, on a fixed day.—
Here, the amount was contingent; payable at differ-
ent times, and on condition that calls for payment to
the United States on the lands, should be promptly
met by the holders of the certificates for the time be-
ing; otherwise the same to be forfeited. The inten-

JANUARY TERM. 1836.

323

ADM'R OF SPENCE vs. WHITAKER, et al.

tion also to authorise the negotiation of these certificates was no less manifest, than it was in respect to the note drawn negotiable in Bank; and the tendency to defraud the assignee, by the claim of a set-off, about the same in either case.

We do not perceive the difference, in principle, so far as this question is concerned, between these certificates, and certificates for stock in a bank or other incorporated company, which, by their charter, are made transferable by assignment. Certificates for bank stock, are not usually declared by the charters, to be negotiable, nor the right to set off demands against the assignors, to the prejudice of the assignees, expressly denied—yet such right is believed never to have been sustained. The idea seems to have prevailed universally, that the allowance of such sets-off was incompatible with the nature and object of such institutions; and we consider the same views alike applicable to associations of the character of the one in question.

The assignment of these certificates of stock has been attempted to be assimilated in argument, to an assignment by a copartner, of his interest in the concern—in which case the assigned interest would be subject to be discounted to the amount of all debts existing against the assignor, in favor of the other partners. To this argument, it is sufficient to reply, that an ordinary partnership is so far different from this association, as to destroy the force of any analogy between them, in reference to this question: that it is so, from the circumstance alone, that by law, such partner's interest is not assignable, so as to constitute the assignee a partner, in lieu of the assignor. It is not to be doubted, however, that partners are

competent, by the terms of their articles, to make valid stipulations to this effect, and render such binding on themselves, as this company have done, by the terms of their association ; with the nature of which, such assignments are far more consistent.

After the views already taken of the case, the remaining questions may be briefly disposed of.

2. In reference to the second point, it is to be observed, that Whitaker was the chief agent in all the company transactions—that he was the most active trustee, and also the treasurer—that his situation must have given him an intimate knowledge of the state and condition of the affairs of the company— that no other could have any satisfactory knowledge concerning them, unless derived through him. That Spence, after he had acquired an interest in all Tilford's stock, by having received possession of the certificates, and a power of attorney to represent them, and sell them for his own benefit; and this, for a valuable and sufficient consideration, could not ascertain from Whitaker the true situation of the concern, or any thing near the value of the stock. On the contrary, that Whitaker had failed to keep a register of the accounts, as, by the articles, he was required to do; and of which, if kept, Spence, as a stockholder, would have been entitled to an inspection. This, at least, would have shewn him the amount of *credit* and *debit*, for and against the company ; and, consequently; the *data* from which an estimate of the value of the stock could have been formed. For the want of correct information, he was induced to believe, that the shares, which afterwards proved to be worth four hundred and fifteen dollars, each, were only of the value of ninety-two dollars and nine-

ty-four cents, and to sell six of them to this trustee, at this grossly inadequate price. The unequal, unjust and oppressive bargain, was the result, mainly of Spence's erroneous impression, that Tilford's debt, (nearly equal in amount, to the value of the certificates,) operated as a lien or incumbrance on the stock, which Spence held, and part of which he then sold to Whitaker. This was at the time when the call was to be met, by the stock-holders, 'for money to pay the government the original land debt—when a failure to pay, would produce a forfeiture of the stock, and when Spence was under the necessity of relying, for the means to meet the call, on the dividends of the stock, or a sale thereof.

The important fact here alluded to, and which cannot be without its influence on this point, is, that this erroneous estimate of the value of the certificates, and the idea of the incumbrance upon them, were created, and strenuously insisted upon by Whitaker; who, being the trustee, had a much better opportunity of knowing the true value, than Spence, or any other, and, in whom confidence had been reposed, for this purpose, and for his correct management of the same.

These circumstances appear to present a case, to which the principle, that a trustee, in whom faith and confidence have been reposed, and whose agency imparted to him a more intimate knowledge of the condition and value of the subjects of the trust, than the *cestui que trust*, or others, could possess, and who has taken advantage of his superior knowledge, to force an unequal bargain, is peculiarly applicable, on the ground of either constructive or intentional

fraud. It may be, that stock had previously sold at only the same rate, the sales, perhaps, effected in the same way; but, it cannot be maintained that a fair price was given by Whitaker—but the contrary fact, that he purchased at much less than half the value, is most manifest.

Admitting the principle, that in such cases, the subsequent approval or assent of the *cestui que trust*, or his ratification of the sale, will remove the objection of fraud; yet, the argument, in this case, that Spence's prior approval and assent, the contract having been made with him, should have the same effect, cannot be sustained, for the obvious reason, that it was in effecting this purchase, that Whitaker availed himself of his superior knowledge and power, to secure the advantage complained of—an objection, which has never been waived. We are of opinion, that, whether the evidence of artifice, misrepresentation and fraudulent design alone, would be sufficient to avoid and annul this contract, that these circumstances, existing between a trustee and *cestui que trust*, are amply sufficient, according to the current rules of decision, in England and America, and which have, in several previous cases, been recognised by this court,

We, therefore, on the ground, that the sale of the six shares from John Spence, as attorney in fact, for Tilford, to Whitaker, was fraudulent and void, declare a rescission of it.

That Spence, at the time, acted in the capacity of attorney for Tilford, is considered immaterial, as the former had previously acquired the beneficial interest in the certificates, and then held an equitable title to them.

ADM'R OF SPENCE *vs.* WHITAKER, et al.

3. On the third point, it is sufficient to say, that Whitaker, having been the active agent as trustee for all the company, while the members generally, were not required to render any personal services—and, especially, for the reason that he also served the company as treasurer, a duty confided to, and re-quired of him alone, his claim, in this respect, is distinguishable from the claim for personal services, by ordinary trustees, or partners in trade.—That, in justice and equity, he was entitled, to reasonable compensation for his services; and, as it does not appear, that the compensation allowed him, by the decree of the Circuit Court, was exorbitant or unreasonable, the decree, so far as relates to this allowance, is affirmed.

4. As respects the allowance of the five hundred dollars, as a fee against the complainant, for the defendants' counsel, in this case, a consequence of our decision on the two first parts, is, that, however just the claim of the counsel to this amount of compensation, it is no charge against the party who was compelled to sue, and against whom they were interposed.

The result of these views is, that the decree of the Circuit Court be reversed, in relation to the points considered, except so far as it allows the fifteen hundred dollars to Whitaker, for his services, and in this, that it be affirmed. That this Court, having the necessary *data,* will proceed to render such decree as the Circuit Court should have rendered : therefore, the clerk of this Court is directed to compute the amount due the plaintiff in error, accord-

ing to the principles of this opinion, and prepare a decree accordingly, and charge the defendants in error with all the costs of this Court and the Court below.

HOPKINS, J., not sitting.