Tuttle *vs.* Walton.

No. 10.—Isaac S. Tuttle, plaintiff in error, *vs.* Robert Walton, defendant in error.

A by-law which asserts a lien on the stock of members of a corporation, for debts due the Company, is, as between the corporators themselves, valid and binding.

A purchaser, under execution at Sheriff's sale, of stock or shares of a corporator, with notice of a lien of the Company upon such stock, under a by-law of the corporation, for the indebtedness of such corporator to the Company, (the lien created by such indebtedness under the by-law, being prior in point of time, to the lien acquired under the judgment,) purchased only such title as was in the corporator, and no other ; and, therefore, was not entitled to a transfer of the stock so purchased, under the act of 1822, without first discharging the lien created by the corporator's indebtedness under the by-law.

This was an action on the case, tried in the Superior Court of the county of Richmond, before Judge Gamble, at March Term, 1846 ; the facts of which are as follows : On the 4th of October, 1840, William Glendenning became the proprietor of twenty-five shares of bank stock of the Augusta Insurance and Banking Company. In the script (the evidence of his ownership) is the following clause : " *Which stock is subject to the payment of all debts due, or to become due, from said stockholder to the said Company, either as principal, security, or otherwise, and is transferable only on the books of the Company.*" The following is one of the by-

laws of the corporation : " *No stockholder who may be indebted to the institution, as payer or endorser on any note or notes, laying over and dishonored, shall be permitted to transfer his stock: the Company shall, in that case, be considered a creditor in possession; and such possession, and such dishonored note or notes, shall constitute a lien on the stock, which shall be held subject to the payment of such note or notes.*"

Glendenning became liable and indebted to the corporation, as endorser of a note for $3,500, dated January 27, 1842, and payable sixty days after the date, which was duly noted and protested for non-payment, and notice thereof given, and which is still lying over in bank dishonored.

Subsequent to the maturity and dishonor of this note, Isaac S. Tuttle (the plaintiff in error) obtained a judgment against Glendenning in the Inferior Court of Richmond county, and in 1843, caused execution, issued under said judgment, to be levied upon the said twenty-five shares of stock, (which were then, and still continued standing upon the books of said company, in the name of said Glendenning,) agreeably to the provisions of the Act of 1822, entitled " An Act to make bank and other stock subject to execution."[a]    At the sheriff's sale, on the 6th of June, 1843, when the sheriff was proceeding to sell, the Augusta Insurance and Banking Company gave public notice of their lien upon the stock, by virtue of the by-law and script issued in conformity thereto before mentioned, for the payment of the said note.  The sale proceeded, and the plaintiff in error (being the plaintiff in execution) became the purchaser, and made a demand upon the defendant in error (who was, and continued to be, the Secretary and Treasurer of said company, and the officer whose duty it was to make transfers and issue script of stock in said company) for a transfer of the shares so purchased, agreeably to the above-recited Act ; which transfer was refused.  Upon this refusal, the plaintiff in error brought his action on the case in the court below ; to which the defendant in error pleaded, *first*, the general issue ; and *secondly*, the lien of the company on the shares purchased as aforesaid as herein before set forth ; and the notice given at sheriff's sale.  The defendant in error confessed judgment, subject to the opinion of the court below, upon his *second* plea, which was admitted to be true in *fact*.   The plaintiff's counsel subsequently in the Term aforesaid, in the court below, moved for leave to enter judgment upon the said confession ; which was refused—the defendant's said second plea sustained, and the confession set aside.   To which decision of the court below, the plaintiff's counsel excepted ; and for specification of the errors complained of therein, assigns—

1st.  That the court decided that the Act, entitled " An Act to make bank and other stock subject to execution," approved 21st December, 1822, created only a qualified lien on bank stock.

2d.  That the court decided that a purchaser at sheriff's sale, under the

---

(*a*) " An Act to make Bank and other Stock subject to Execution."  (*Approved December* 21, 1822.—*Dawson's Comp.*)

Sec. 1. " From and after the passing of this Act, the shares or stock owned by any person in any of the banks, or other corporations in this State, shall be subject to be sold by the sheriff or his deputy under execution."

Sec. 2. " When any sheriff or his deputy shall have placed in his hands any execution against any person who owns any stock or shares in any of the banks or corpo-

Act of 1822, acquired no better title to bank stock, than a voluntary purchaser, anterior to that Act.

3d. That the court decided, that because the purchaser at sheriff's sale had notice of the encumbrances, liens and conditions under which Glendenning held the stock sold, he therefore must take it, as it was held by Glendenning, subject to all the equities and rules of law to which it was subject in his hands.

4th. That the court decided, there was nothing in the by-law pleaded by defendant, repugnant to the laws or constitution of the State of Georgia.

5th. That the court decided, that said by-law was in conformity with the principles of equity and justice—the laws of trade and public policy.

6th. That the court sustained the validity of said by-law.

JENKINS, for Plaintiff in error.

The question at Bar is reduced to a competition between the lien of the plaintiff's judgment against Glendeming, under which he purchased at sheriff's sale, and the lien of the By-law upon which defendant relies. *Per se* the plaintiff's lien is indisputable. But the conflicting lien is prior in point of time, and if of equal dignity must have the preference. What is the character of this lien ? Liens arise either by operation of law, or from contract. This lien is not created by statute; is unknown to the common law.—*Angell and Ames on Corporations*, 296.

It is founded in no express contract.

It must be supported, if at all, either by raising an implied pledge, by connecting the By-law with the subsequent endorsement and dishonor of the note set forth in defendant's answer, or by giving to the By-law the force and effect of municipal law. The question is substantially the same. If to raise the implied contract, recourse must be had to the By-law as its foundation, and if that be void, then the implied contract must fall with it.

The true light, however, in which to regard By-laws, is to consider them as acts of legislation, authorized by the charter, or assumed under it. The Legislature did, in fact, give to this corporation by charter a limited legislative power—limited first in

rations of this State, it shall be lawful, and he is hereby required, on application of the plaintiff, his agent, or attorney, to endorse on said execution a levy of the number of shares belonging to the defendant, and after advertising the same agreeably to the law regulating sheriffs' sales, shall thereafter proceed to sell the said shares or stock; provided always, that he shall set up one share at a time, and shall sell no more than is sufficient to satisfy the amount of executions then in his hands."

Sec. 3. " When any constable shall have any execution placed in his hands against any person who is the owner of any shares or stock in any bank or other corporation in this State, it shall be lawful, and he is hereby required, on the application of the plaintiff, his agent or attorney, to endorse a levy on said execution or executions in like manner; and it shall be his duty to make returns of the same to the sheriff of the county in which he lives, which said sheriff shall proceed to sell as pointed out by the second section of this bill."

Sec. 4. " When the sheriff or his deputy shall sell any shares in any bank or other corporation in this State, he shall give a certificate of such sale to the purchaser."

Sec. 5. " The officer of the bank or other corporation, whose duty it may be to make transfers of stock on the books of the bank or other corporation, shall, and he is hereby required to make a transfer of the stock purchased under this act, to the purchaser of the same, upon his, her, or their producing certificate or certificates to the said officer."

Sec. 6. " Any transfer made by the defendant, of his bank or other stock, after judgment obtained against him or her, shall be void : Provided, that notice of the obtainment of such judgment be served on the Cashier of such principal bank, or any of its branches, or the proper officer of such other corporation, within twenty days after said judgment is obtained."

its objects to the internal affairs of the corporation; second, in its subjects to the members of the corporation; thirdly, to a strict conformity to the constitution and laws of the State, and to public policy. If within these limits it is good, otherwise void.

The By-law is intended to accomplish two objects:—

1st. To prevent a voluntary transfer of shares of the capital stock by an indebted corporator.

2d. To create a lien upon such shares for the payment of the debt owed by such corporator.

To the first point we cite 8 Pickering's Rep. 90:

But the By-law may be good for this purpose, yet bad for the second.

No case can be found directly in point, for or against the second proposition. In support of the first, there are authorities.

But for the purpose of distinguishing the two cases, he cited 6 Pickering, 324; 10 Pickering, 454.

We maintain that this By-law is void:

1st. Because it is repugnant to statutes of the State.

2d. Because it affects the rights, and interest of strangers to the Corporation.

3d. Because it is against public policy.

I. It is repugnant to the Judiciary Act of 1799, *Hotchkiss Dig.* 597—8. And to the Act of 1822, (*ante*) which makes " Bank and other stock subject to execution." *Hotchkiss* 604—5. The Act of 1822 settles conclusively that bank shares are personal property, and the legal estate in him who holds the script.

What constitutes repugnancy?

Lexicographers define repugnant to mean, " *contrary to*," " *inconsistent with*."

The repugnancy need not be co-extensive with the operation of the Act; may be total, extending to all cases; or partial—limited to a few.

In each case that may arise, the question *quoad* that case, repugnant *vel non.* Whenever it occurs the By-law must stand still—the statute must have its course. In the case at Bar regular proceedings were had under the statute, until the plaintiff arrived at the point at which the law directed that the defendant should make him a transfer of the shares purchased. This transfer was refused, and the provisions of the By-law assigned as a reason. Then the statute commands that a particular *Act* be done, and the By-law prohibits the doing of it. Either this is literally true, or the By-law furnishes no defence in the case.

The mandate of the Statute is clear. The defendant's disobedience is confessed, and the court is called upon to decide that the By-law furnishes a full justification for such disobedience.

Then can it be held that the two are not opposed—not contrary, the one to the other—not inconsistent, the one with the other—that the prohibitory By-law is not repugnant to the mandatory Statute?

Suppose that, subsequent to the act of 1822, the General Assembly had passed a general act in relation to banking and other monied corporations, containing the provisions of this By-law—and that this case had arisen under it. The defence must have been successful. But upon what principle would the court have given precedence to the supposed Statute? Upon this only—" *Leges posteriores priores contrarias abrogant.*" The court would have held that these statutes were both of force, but that where they conflicted, where they were *repugnant,* they must give effect to the latest expression of legislative will. Such a decision would proceed upon the ground of repugnancy.

Then is not the repugnancy between the Statute and the By-law equally clear? The very question is, shall the Statute or the By-law govern the case? If the former, the plaintiff's redress is certain—if the latter, the defendant's immunity is equally certain.—1 *Peters C. C. R* 390; 2 *Green N. J. Rep.* 222.

It may be said there are liens recognized by law, as equivalent to judgment liens. But these are all legal liens, executed or recognized either by statute or common law. There the competition is resolved by comparison of ages. But a lien competing with a judgment lien, must be raised to the platform of law, before the latter can be remitted to the test of time.

The defendant's difficulty is, that the lien he sets up is recognized by no law, common or statutory. The Legislature might have given the company such a lien by provision of the charter; for they may by law confer a right, incompatible with pre-existing law. They not having chosen to do so, the corporation can make no such

Tuttle *vs.* Walton.

enactment, by reason of the express limitation upon their legislative powers contained in the charter which confers them. "They shall make no By-law repugnant to the Constitution or laws of the State."

II. We say this By-law as against the plaintiff is void, because he is a stranger to the corporation. It is a common law principle, that except in cases of local jurisdiction given by Statute, or resulting from prescription, the By-laws of corporations affect only their own internal affairs, and are binding upon their members only.— *Comyns Dig. Title By-law C.* 2 ; *Angell and Ames on Corporations,* 301 ; *Johnson's Rep.* 115.

III. We say this By-law is void, because against public policy.

1st. It generates secret liens.

All the legislation of Georgia is in direct hostility to secret and dormant liens. Mortgages are required to be recorded.—*Hotchkiss,* 420.

Liens of master carpenters and masons upon buildings erected by them are required to be recorded.—*Hotchkiss,* 623-5. Upon the same principle rests all of our legislation relative to dormant Judgments. Banks are required to publish annually the names of their stockholders, and the number of shares held by each.—*Hotchkiss,* 360, 1.

This publication gives credit to individual stockholders.

Does the law intend to invite credit by publishing to the world that A B and C are the owners of certain valuable property, and at the same time to delude the public by supporting and sanctioning secret liens upon this property ?—7 *Wheaton's Rep.* 46.

Banking institutions are numerous, and their stockholders vastly more so, and many, very many of them, commercial men actively engaged in trade.

If these liens become prevalent great injury must result from them.

2d. Such liens are in restraint of trade. Whilst they improve the credit of stockholders in the particular corporations of which they are members, they impair it with the community at large.

3d. Such By-laws open a door to fraud, by inviting collusion between corporations and their members.

A. J. MILLER, for defendant.

The By-law relied upon by the defendant is valid.—2 *Peere Williams,* 207 ; 1 *Harrington's Rep.* 27 ; *Wordsworth on Joint Stock Companies,* 310 ; 8 *Sergeant & Rawle,* 73, 88 ; 3 *Porter's Rep.* 321. There is no repugnancy between it and the act of 1822.

The Legislature cannot be supposed to intend authorizing the sale of any more than the defendant's interest in bank stock. Here the right of the company had attached, before the judgment was obtained. Glendenning could not have transferred the stock ; and the plaintiff, especially as he is a purchaser with notice, can have no greater right. Independent of the By-law, the script issued to Glendenning shows the condition upon which he held the stock ; and the purchaser at Sheriff's sale must take it subject to the same conditions. The lien of the company is a bar to the plaintiff's action, notwithstanding the title to the shares was in Glendenning.—17 *Sergeant & Rawle,* 285.

The judges not being unanimous in their decision affirming said judgment, delivered their opinions *seriatim* as follows :—

WARNER, Judge.

This case, as exhibited to the court by the record, involves the question, as to the validity of the By-law regulating the transfer of stock, by the stockholders in the Augusta Insurance and Banking Company. By the third section of the act incorporating said Company it is declared, the stockholders in said institution "*may make, ordain and establish such by-laws, rules, and regulations, as they may deem expedient and necessary to carry into effect the objects of the institution;* provided such by-laws,

rules, ordinances, and regulations, be not repugnant to the laws or consti-
tution of this State or the United States." It is contended by the plain-
tiff in error, the by-law mentioned in the record is repugnant to the laws
of this State, particularly to the judiciary act of 1799, and the act of 21st
December, 1822, making bank stock subject to execution. I have care-
fully examined both these acts, and have not been able to discover any
repugnance which would make void the by-law in question. The by-
law declares, " No stockholder who may be indebted to the institution,
as payer or endorser on any note or notes laying over and dishonored,
shall be permitted to transfer his stock. The company shall in that case
be considered a creditor in possession, and such possession and such dis-
honored note or notes, shall constitute a *lien* on the stock, which shall
be held subject to the payment of such note or notes."

Did the charter of the Augusta Insurance and Banking Company con-
fer the authority on the stockholders to make the by-law, and if so, is it
a *reasonable* regulation, expedient and necessary to carry into effect the
objects of the institution ? By the fourth section of the charter, it is pro-
vided the capital stock of the company shall not exceed $500,000,
which shall be divided into shares of $100. By the sixth section of the
charter, the company are authorized to insure property and effects,
against loss by fire or water, and all other accidents. By the seventh
section of the charter, the company are bound to pay all losses on pro-
perty or other assurances made by them, within six months after the hap-
pening thereof. By the tenth section of the charter the company are
authorized to issue bills or notes of credit, payable to bearer, and by the
eleventh section of the charter, all bills or notes of credit issued as afore-
said, are to be paid on demand at the company's office. I have referred
to the several clauses in the charter for the purpose of showing what
were the objects and duties imposed on the company, in order that the
expediency or necessity of the by-law, to carry into effect those several
objects, might be the more apparent. I am of the opinion, the charter
clearly conferred the authority on the company to make the by-law, and
that it is not only reasonable, but expedient and highly necessary, to
enable them to carry into full effect the objects contemplated by the
Legislature. This view of the subject is sustained by authority. Where
a charter or statute empowers a corporation to pass such by-laws as are
*necessary*, the by-law to be valid need not recite that it was necessary ;
but the necessity will be implied from the act of passing it, being in fact,
synonymous with *expediency.*"—*Angell and Ames on Corporations*, 299 ;
*Stuyvesant* vs. *the Mayor, &c. of New York* ; 7 *Cowen's Rep.* 606. The
record in this case discloses the fact, there was a by-law made by the
stockholders, which prohibited an individual stockholder who was in-
debted to the Bank, from transferring his stock, and that such indebted-
ness should constitute a *lien* on his stock for the payment thereof. The
record also exhibits William Glendenning as a stockholder in the com-
pany,—that on the 4th day of October, 1840, he became the proprietor of
twenty-five shares of its capital stock ; and in the script, which was the
evidence of his ownership, these words were inserted—" Which stock is
subject to the payment of all debts due, *or to become due from said stockholder
to the said* company, either as principal, security, or otherwise, and is trans-
ferable only on the books of the company." This By-law was obligatory,

and binding, as between Glendenning and the company—as between him and them it had all the force of a stipulated contract.

" By-laws of a corporation obligate its members, on the ground of their express or implied consent to them ; nor is it an objection to a corporator's being bound by a by-law, that he had no notice of it, or that he was not a member of the corporation at the time the by-law was passed."—*Angell and Ames on Corporations,* 301 ; *Stetson* vs. *Kempton, et al.* 13 ; *Massachusetts Rep.,* 282.    Was this by-law, so far as the rights of Glendenning and the company were concerned to the twenty-five shares of stock, repugnant to any law of the State ?    If so, what law or principle of public policy does it violate ?    Being the proprietor of the stock, had he not the right to sell it absolutely, and if so, had he not the right to pledge it, or create a lien upon it, by a bona fide contract, without contravening any public law of the State ?

I am now speaking of the validity of the by-law, as between Glendenning and the Company ; for if the by-law is repugnant to the constitution and laws of the State, it does not bind Glendenning, and he might treat it as a *nullity,* in a contest between himself and the Company ; but it was not contended on the argument, this by-law was not binding and valid, as between Glendenning and the Company, and I do not doubt its validity —indeed the evidence of his title to the twenty-five shares of stock, recites it to be subject to the payment of all debts due, or to become due, by him to the Company.    He became the purchaser of the stock, on the terms and conditions expressed in the by-law, and no other ; and as between him and the Company, it was binding and operative, according to its terms and stipulations.    The record in this case discloses the further fact, that on the 31st of March, 1842, William Glendenning became indebted to the Company by note in the sum of $3,500, which was duly noted, and protested for non-payment ; and is now, in the language of the by-law, " *laying over and dishonored.*"    The indebtedness of Glendenning to the Company is admitted to be a bona fide indebtedness ; but it is contended such indebtedness does not create a lien in favor of the Company under the by-law, so as to justify the defendant in refusing to make a transfer of the stock to the plaintiff in error, who is a purchaser at sheriff's sale under a judgment obtained against Glendenning, *subsequent* to the date of the dishonor of the note mentioned in the record. Assuming the by-law to be valid, as between Glendenning and the Company, the fact of indebtedness on his part being admitted, could Glendenning himself have transferred the stock, and compelled the defendant, as the officer of the Company, to have made a transfer on their books, without first discharging his indebtedness to the Company ?    Certainly not—and why ?    Because the by-law of the Company of which he was a member, declares " No Stockholder, who may be indebted to the institution, as payer or endorser, on any note or notes, laying over and dishonored, shall be permitted to transfer his stock ; the Company in that case shall be considered a creditor in possession, and such possession, and such dishonored note, or notes, *shall constitute a lien on the stock, which shall be subject to the payment of such note or notes.*"    In the case of *Waln's Assignees* vs. *The Bank of North America,* 8 *Sergeant and Rawle* 89, the court say,—" By-laws bind, because the members of the corporation, either individually, or by those who represent them, are

4

supposed to give their assent to them. A contract, express or implied, is the *lien of the parties, and a law to them ;* provided it is not repugnant to the charter, or the laws of the land." We have seen the by-law in question was not repugnant to the charter of the Augusta Insurance and Banking Company ; and the following cases are authority to show it is not repugnant to the laws of the land.—*Child* vs. *Hudson's Bay Company,* 2 *Peere Williams,* 207 ; *Waln's Assignees* vs. *The Bank of North America* before cited, 8 *Sergeant and Rawle* 73 ; *McDowell* vs. *Bank of Wilmington,* 1 *Harrington's Rep.* 27 ; *Cunningham* vs. *The Alabama Life Insurance and Trust Company,* 4 *Alabama Rep.* 652. The contract then, as between Glendenning and the Company, as manifested by the law is "*the lien of the parties, and a law to them.*" His indebtedness to the Company as disclosed by the record, created a *lien* upon the twenty-five shares of stock, and the Company is a creditor in possession ; the stock being subject to the payment of the dishonored note for $3,500.

How far a bona fide purchaser from Glendenning of the stock, *without notice of the lien* created by the by-law, would be protected against such lien, it is not now necessary to decide, or how far the insertion of the terms, on which the stock is held by the stockholder, in the certificate of script (the evidence of his title) would go, by way of notice to the purchaser, it is unimportant to discuss at this time. I have endeavored to establish, both on principle and authority, there was a *valid lien* created on the stock, in favor of the Company, as against Glendenning, which would prevent him from transferring it without discharging the same. At what time the plaintiff in error obtained his judgment against Glendenning, the record does not inform us, but it is stated to have been obtained *subsequent* to the dishonor of the note for $3,500. By the common law, the judgment did not create a *lien* on the stock of Glendenning so as to prevent a transfer of it. By the act of 21st December, 1822, bank stock is made subject to sale under execution, and I concur in the opinion of the presiding judge, in the court below, that the act of 1822 created only a *qualified lien* on bank stock. The 6th section of the act of 1822 declares, " Any transfer made by the defendant of his bank or other stock, after judgment obtained against him or her, shall be void. Provided *notice* of the obtainment of such judgment be served on the cashier of such principal bank, or any of its branches, or the proper officer of such other corporation *within twenty days* after said judgment is obtained." Unless the notice be given within the time prescribed by the act, it would seem the defendant would have the right to transfer his stock, notwithstanding the judgment, and that the lien created by the judgment would not become *absolute* so as to make the transfer void, without the notice being given as required by the statute. The plaintiff in error insists his judgment lien is superior to that of the company created by the indebtedness of Glendenning under the by-law, although the lien in favor of the Company was created, and existing, *prior* to the date of his judgment, under which the sale of the stock to him was made. It is a principle of law applicable to liens of this description, that he who acquires priority in *point of time,* acquires *priority of right.*

The lien of the Company, it is admitted, was prior, in point of time, to the date of the plaintiff's judgment. But suppose it was not—under the state of facts presented by the record in this case, there being no evidence

furnished that the plaintiff ever gave the proper officer of the Company notice of having obtained judgment against Glendenning, one of the stockholders, as required by the 6th section of the Act of 1822—would the rendition of the judgment, without the notice, prevent Glendenning from transferring his stock, either absolutely, or creating a valid lien upon it? The Act of 1822, it will be recollected, is in derogation of a common law right, and must be *strictly* construed. It also appears from the record in this case, at the time of the sale of the stock by the sheriff, the bank gave public notice of their lien upon the same, by virtue of the by-law; at which sale the plaintiff became the purchaser, and now contends he is entitled to have the stock transferred to him by defendant, discharged of the lien created by the indebtedness of Glendenning to the Company, through whom he claims title.  A purchaser at sheriff's sale purchases such title only as was in the defendant in execution, and no other.  If the property purchased is encumbered by a lien, the purchaser takes it *cum onere;* and he has certainly much less equity in his favor, when he purchases the property, as in this case, with a full knowledge of the lien, now urged by the defendant.  In the case of Walns, assignee, *vs.* The Bank of North America, the court say—"A stockholder who borrows money of a bank, with full knowledge of an *usage* not to permit a transfer of stock while the holder is *indebted* to the bank, is bound by such usage, and neither he nor his assignees under a voluntary general assignment, can maintain an action against the bank for refusing to permit his stock to be transferred.  The agreement of the stockholders would be equally binding on them, *and all who stand in their shoes,* as a By-law."  In this case there was a *By-law,* as we have seen, expressly prohibiting the stockholder from transferring his stock, while indebted to the bank, and creating a *lien* thereon: and the plaintiff being a purchaser at sheriff's sale, with *notice of the lien,* stands in the shoes of Glendenning—acquired all his rights to the stock, and none other.

It was said in argument, that the stock, standing in the name of Glendenning on the books of the bank, and published to the world as his stock in the bank reports, and the lien created by the By-law being secret, it was contrary to public policy and a fraud upon creditors ; that it was the policy of our laws to have secret liens made public, as was apparent from our general Registry Acts.  Perhaps it would be a sufficient answer to this argument, to say, the Legislature, in their wisdom, thought proper to confer upon the stockholders of the Augusta Insurance and Banking Company the power of qualified legislation ; they have enacted the By-law creating the lien ; that lien was not required by either the common or statute law to be made public ; and our statutes requiring certain liens to be registered, are in derogation of the common law, and cannot be extended to other liens than those enumerated by *implication.*    While, as a legislator, I might be disposed to give my hearty assent to that part of the argument for the plaintiff in error, which so forcibly pointed out the evils to the community by the exercise of the *extraordinary* powers of legislation by Corporations, in the enactment of By-laws ; yet as a judicial officer, I feel bound, by the highest considerations of public duty, scrupulously to protect the *vested rights* which have been legitimately acquired under them.  Viewing the By-law in question as a *contract,* binding on the parties who enacted it, I feel bound to protect the lien on

the stock created by it. " A lien may exist under agreement, in favor of the general body of proprietors of a bank upon the stock or shares of individual shareholders; but this right is generally reserved, by the express terms of the deed of settlement under which the company or partnership is established. Nor will the *bankruptcy* of the shareholder prevent the operation of the lien upon his shares; where, under such arrangements, the certificates of his ownership are permitted to remain *in his possession.*"—*Cross on Law of Lien*, 318; *Ex parte Plant* 4 *Deacon and Chitty*, 160. The public interest, in my judgment, will best be promoted by sustaining this By-law of the Company, when we take into consideration the duties and obligations imposed by the charter. By giving the Company a lien on the stock, for debts due by the individual stockholders, it certainly enables them to be the better secured against loss by insolvency, and thereby the better enabled to pay the losses of those who may be insured by them; besides, the *bill-holders*, who are to be looked upon as favorite creditors, will be better protected than they otherwise would be, if the capital stock of the bank was to be appropriated to the payment of the debts of the individual stockholders, in preference to debts due the Company, which, in all probability, were created on the footing of this identical By-law. Suppose the bank unable to redeem its liabilities, (an event which I trust will never happen,) and a bill in equity filed against the Company by the *bill-holders* for the purpose of subjecting the twenty-five shares of stock standing in the name of Glendenning to the payment of their claims, by virtue of the lien acquired by the Company under this By-law; who would have the superior equitable claim to the stock, the bill-holders or the plaintiff in error, claiming as a judgment creditor of an individual stockholder, whose judgment is of younger date than the lien credited in favor of the Company under the By-law? To the extent this By-law strengthens and protects the institution from loss, to just the same extent does it give the ability to discharge its duties to the public, as required by the charter, and prevent *fraudulent* stockholders from injuring the Company or the public creditors of the institution. I am therefore of the opinion, the Act incorporating the Augusta Insurance and Banking Company conferred the authority on the stockholders to make the By-law in question, that the same is not repugnant to the charter, nor the laws of the land, nor is it against public policy, or in restraint of trade; but on the contrary, it is a valid By-law, calculated to promote the interest and objects of the institution, as contemplated by the Legislature. I am also of the opinion, the By-law was binding and operative, as between the stockholders themselves, and the indebtedness of Glendenning, as exhibited by the record in this case, created a valid lien upon his twenty-five shares of stock in favor of the Company. That the lien of the Company created by the indebtedness of Glendenning under the By-law, being *prior* in point of time to the lien acquired by the plaintiff under his judgment, the Company acquired a priority of right. That the plaintiff, who was a purchaser at sheriff's sale, with *notice* of the lien of the Company upon the stock, under the By-law, purchased only such title as was in Glendenning to the twenty-five shares of stock, and no other; consequently, is not entitled to a transfer of the stock at the hands of the defendant, without first discharging the lien created by the indebtedness of Glendenning to the Company, through

whom he derives his title. Let the judgment of the court below be affirmed.

LUMPKIN, Judge, concurring in the affirmance of the judgment below, gave the following opinion :

My opinion in this case is predicated exclusively upon the ground of notice ; and I should be content to concur silently in the *judgment* to be rendered, did not the law make it obligatory on each of us to express his opinion in all cases where we have the misfortune to disagree. As it is, I shall be brief, as my learned brethren on my right and left will assign their reasons at length for the different conclusions to which they have respectively come.

It seems to be admitted on all sides that, as between the corporators themselves, a by-law would be good which asserts a lien on the *stock* of the members for debts due the company. A provision to this effect is frequently contained in the statutes conferring charters, and is a standing by-law in almost all corporations. Tuttle, the plaintiff in error, purchased at sheriff's sale, with full and explicit knowledge of the existence of this lien. Does it lie in his mouth to contest its validity, or to claim exemption from its operation ? I think not. As the judgment creditor and plaintiff in execution, had he discontinued the sale when the notice was given by the bank, and gone into Equity, as it was clearly competent for him to have done, my impression is that he would have been entitled to a decree for a sale unencumbered by the lien, unless notice could have been brought home to him of the *by-law* at the time he contracted with Glendenning ; or, had he, or any one else, bought this stock, publicly or privately, without such notice, *theirs*, I think, would have been the better Equity.

I am aware that *caveat emptor* is the settled rule applicable to all judicial sales. It cannot be otherwise, from the very nature of the transaction, because there is no one to whom recourse can be had for indemnity. No warranty, express or implied, can be raised upon the part of the owner as to whom the proceeding is compulsory, nor of the sheriff, who is the mere ministerial agent of the law, nor of the court, under whose authority the sale is made. Of necessity, therefore, the purchaser takes all risks ; and yet, notwithstanding this doctrine, as now advised, I would compel the bank, under the Act of 1822, to transfer the stock in favor of a bidder who was ignorant of their lien. It would be in vain to tell me that all who attend sheriff's sales should take care and examine into the titles of the property offered in the market. I would, in opposition to any suggestion of this sort, plant myself immovably upon the publication of the corporation itself in the gazettes of the State, proclaiming, *on oath*, semiannually, to all the world, that Glendenning was the owner of the shares standing in his name.—*Prin. Dig.*, 49 ; *Hotchkiss*, 360, 361. Here would not only be the absence of notice, the fundamental and predominant feature in the whole of our legislation creating liens, as in the cases of mortgagees, mechanics, and the like, but direct and positive notice to the contrary, to wit, that the stockholder was the absolute proprietor of the property ; and with no simultaneous act of the company to put persons upon the look-out or inquiry. I repeat that, under such circumstances, I never could yield my consent to see innocent purchasers and creditors suffer.

Unfortunately for Mr. Tuttle that is not the case which he makes. He comes before us as a mere volunteer in this controversy. The lien of the bank was advertised. Bystanders were notified of the existence of the contract made by Glendenning with his partners, that stockholders who were indebted to the institution should not transfer their stock while the liability lasted, and that the company should be considered as creditor in possession, and that this state of facts should constitute a lien on the stock until the debt was discharged ;—that a note of $3,500, on which Glendenning was the endorser, had been laying over and dishonored since the last of March, 1842, and duly noted and protested for non-payment—a period long prior to the rendition of Tuttle's judgment. And it was farther made known that a clause was inserted in Glendenning's scrip, the evidence of his ownership, that his stock was subject to the payment of all debts due, or to become due, from him to the company, either as principal, security, or otherwise, and that the same was transferable only on the books of the bank. In the face of this notice, Tuttle proceeds with the sale, knowing full well that he was buying property thus encumbered, and with the ground of the adverse claim spread out before his eyes. He grasps the stock, it may be to secure his debt, as *tabula in naufragia*. Thus forewarned, *he* has not been deceived or ensnared, *whoever else* may be. He takes the stock, *cum onere*, and on that account purchases, necessarily, at a great sacrifice. I do not see that we can help him. This is not a case of *crassa negligentiæ*, for which there could be no relief. It is worse. It is the case of one who, in the language of Lord Bacon, traffics for what, in Equity, he knows at the time to belong to another.—2 *Chan. Cas.*, 246. I have no hesitation in concluding that the purchase at sheriff's sale, under these circumstances, ought to be adjudged subject to the interest and lien of the corporation ; and it were easy to fortify this position, did the occasion require. A vendor's lien for the purchase money of land is not only good against the bargainee and his heirs, *but third persons, likewise, who purchase with notice.*—10 *Yerg.*, 186 ; 9 *Cowen*, 316 ; 4 *Black*, 339. Indeed this broad and sensible distinction runs through all the law, in every branch of it.—7 *Watts*, 332 ; *Powell on Mortgages, vol.* 2, *c.* 14, 561, 662 ; *Notes by Coventry—et passim.* The doctrine of the English law of liens is not favored in the American courts, and our Registry Acts are designed to give protection against latent Equities.—14 *Sergt. & Rawle*, 333 ; 3 *Pick.*, 149 ; 8 *Greenleaf*, 94.

Profiting as much as my time would permit, since the argument at bar, in searching for authorities, I have been enabled to lay my hands on two cases, bearing directly on the question. And while I cannot concur fully in all the conclusions at which the court arrived in either ; still, as they both abundantly sustain my own position, I will advert to them. These adjudications, it is true, are not the law ; but, like all others from our sister States, they are the evidence of what the law is. One is the case of the administrator of Spence *vs.* Whitaker and others, decided by the Supreme Court of Alabama.—3 *Port. Rep.* 297. A number of individuals of that State associated themselves together, in 1818, by articles of agreement, under the name of the Courtland Company. The object was to lay off, and sell out, a town, on certain lands they purchased. They divided the stock into one hundred and sixty shares, for each of which a certificate issued.

By the articles, these certificates were assignable, and the assignee was entitled to all the benefits, and subject to all the conditions and penalties of the original parties.   One Tilford being the owner of nineteen shares, deposited the same with one Spence, as collateral security against a heavy responsibility, incurred by Spence for Tilford, who, at the same time, executed a power of attorney to Spence, authorizing him to sell and transfer said stock.   In pursuance of this arrangement, thirteen of the shares were sold.   The holder called on the agent and manager for the Company, for the dividends due on those shares, who refused to account therefor *until the assignee paid and satisfied a debt due said Company from Tilford.*   It was admitted that the purchaser was ignorant of the Company's claim, until long after the transfer, and that, at the formation of the Company, there was no express understanding respecting the lien now set up in its behalf; but that they acted upon consultation with counsel, who advised that it was their legal right.

On the first hearing of the bill, the Chancellor admitted the offset of the Company's debt to go against the thirteen shares ; the decree was reversed by the Appellate Court.   Chief Justice Saffold, in delivering its opinion, says : " While it must be conceded that the company or trustees had no power to adopt rules which were repugnant to the laws of the land, *yet they had the undoubted right to stipulate such terms, and prescribe such rights, forfeitures and conditions, as were not prohibited by law ;* consequently they had a right, while adopting the articles for their government, and issuing the certificate for the stock, to have provided a lien upon them, for debts due the company from the original, or any subsequent, stockholders."   And the rejection of their claim is put expressly upon the fact " of their having declined the insertion of any such stipulation, in either instrument ;" to wit : the articles, or the certificate.   *Here it is incorporated in both.*   Again, " the decision," says the Judge, " must materially depend on the terms of the articles of association under which the certificates issued, and the nature and objects thereof.   That it was competent for the company, by their articles, to have retained a lien on the certificates, as well as on the lots sold, to secure the debt due them, cannot be questioned.   Yet it may be doubted if they could have done so with good faith, without expressing the lien in the certificates, as they did in the title bonds, or *giving it publicity in some other way.*"   In other words, the comparative rights and equities of the adverse claimants is made to depend, in the opinion of the Chief Justice, upon the question of notice.

The other is the case of Fitzhugh *vs.* the Bank of Shepherdsville and others, decided by the Court of Appeals of Kentucky.—3 *Monroe's Rep.,* 126.   Fitzhugh endorsed a Bill of Exchange to the United States Bank for Thomas J. and Henry H. Roberts.   It was protested for nonpayment, and on notice thereof taken up by Fitzhugh.   Upon application to the drawers to be re-imbursed, they gave him forty-five shares of stock in the Bank of Shepherdsville.   The Messrs. Roberts held the scrip of the Bank for the shares, or a certificate of the number and amount, stating on its face, that the stock was transferable only at Bank personally, or by attorney.   Letters of Attorney to the cashier were executed, authorizing him to make the transfer.   He refused to do so, alleging as the only reason in behalf of the Bank, that the Messrs. Roberts were then indebted to the

Bank a sum of money due by notes endorsed, and it was understood, when the accommodation was given, the stock was a pledge for the payment, although there was no writing to that effect. Fitzhugh brought his bill against the Bank to compel an assignment of the stock to him, and to account to him for the dividends that had accrued since the transfer. The question was which was entitled to the preference. The court below decided in favor of the Bank, from which an appeal was taken. The judgment was reversed on the ground that the Bank "had no express pledge of the stock." Judge MILLS, who delivered the opinion of the court, says: "Bank stock is an article of commerce, and the certificate of shares is not only the evidence of title, but the evidence of the negotiability of the stock, and must be taken as conclusive evidence against the Bank that the stock is saleable and free of encumbrance. If the Bank wishes to avail itself of such a pledge, it must take from the holder this evidence of title and transferable quality, and *show an express pledge*, otherwise the holder of such evidence might delude and impose upon purchasers, and the *Bank stand as a tacit accomplice in that delusion*, and *then be permitted* to take from an innocent purchaser the title thus acquired."

I concur heartily in this opinion and the reasoning by which it is supported. Here it will be perceived that there was no evidence of a special pledge of stock. The point was, had the Bank a general lien by law on the stock held in the institution by their debtors, notwithstanding they had issued the scrip, declaring the existence of the stock and its negotiability?

I return then in conclusion, to the point from which I started, and that is, that the fact of the periodical publication of stock under the act of 1832 will likely, when the proper issue is made, over-ride the lien, secured by the by-law and incorporated in the scrip. But so far as Mr. Tuttle is concerned, we are precluded from any such inquiry by the notice given to him on the 6th day of June, 1843, when, as *purchaser*, he for the first time became connected with the transaction, and in which character he is now invoking the aid of the court, to perfect his title by compelling the Bank to transfer the stock.

Whereupon it was adjudged and determined that the judgment of the court below stand affirmed.

NISBET, Judge, *dissenting.*

I have not been able to bring my mind to concur with my associates in the judgment rendered in this cause. This is to me a source of sincere regret. I esteem it a personal misfortune. I have labored to see this question in the light in which they view it, but have been unable to attain to the same conviction. With profound respect for them, and sincere distrust of the justness of my own conclusions, I am constrained to dissent. On the 4th Oct., 1840, William Glendenning became the proprietor of twenty-five shares of the capital stock of the Augusta Insurance and Banking Company; a corporation clothed with insurance and banking powers. He afterwards became endorser upon a note discounted by that Bank for $3,500, which about the 1st April, 1842, fell due and was protested for nonpayment. Subsequent to the dishonor of this note, Isaac S. Tuttle (the plaintiff in error) obtained judgment in Richmond Inferior Court against Glendenning, and in January, 1843, caused the execution issued thereon to be levied on the shares of stock owned by him in said

company, and standing in his name on their books, agreeably to the provisions of the act of 1822, entitled " An Act to make Bank and other stock subject to execution." On 6th June, 1843, when the Sheriff was proceeding to sell, the company gave public notice of their lien upon the stock, by virtue of one of their By-laws, which is in the words following, to wit : " No stockholder, who is indebted to the institution, as payer or endorser on any note or notes laying over and dishonored, shall be permitted to transfer his stock. The company shall in that case be considered a creditor in possession, and such possession, and such dishonored note or notes, shall constitute a lien on the stock, which shall be held subject to the payment of such note or notes." At the sale the plaintiff in execution and the plaintiff in error (Tuttle) became the purchaser of the stock, and having procured the Sheriff's certificate of that fact, made demand upon the defendant in error, (Walton,) who was the secretary and treasurer of said company, charged with the duty of making transfers of the stock, for a transfer of the stock thus brought, agreeably to the act of 1822. Walton refused to make the transfer, whereupon the plaintiff in error brought his action in the court below, to which action the defendant pleaded the lien of the company upon said stock in pursuance of the By law before recited, and the notice of it given at the Sheriff's sale. Upon the trial the defendant confessed judgment, subject to the opinion of the court on the plea of lien and notice, the plea being admitted to be true in fact.

The court below sustained the plea, and the error is alleged to be in that decision. The decision of the court was excepted to on a number of grounds. It is not necessary to state here, much less to advert with any particularity to many of those grounds of error. The questions made by the record are—

1st. Whether the By-Law of the company be valid between Glendenning and the company ?

2dly. If valid as between Glendenning and the company, is it valid as between his creditors and the company.

And 3dly. Whether it is valid as between the purchaser at Sheriff's sale under the provisions of the act of 1822, with notice given at the time of sale, and the company.

There doubtless are various ways of stating the points at issue. I think the above form truly states them. It is obvious that the contest here is between the lien of the Bank by virtue of its By-law, and the title of the purchaser of the stock, claiming under a judgment against the owner, in favor of a creditor without notice of that lien. I know of no instance in our State, in which the sustainability of such a lien has been directly adjudicated, as between the Bank and strangers ; and no case in the course of the very able argument before this court, has been adduced on either side, wherein that question has been made and decided. In every view of this case, the court is compelled to pass upon the validity of the By-law. The pleadings with marked distinctness present that question. The defendant comes into the court below with the by-law of the company in his hand, and having plead it in bar of the plaintiff's action, demands the judgment of the court. He tenders the issue in behalf of the company. Through him the company sets up this lien,—upon that issue the judgment is awarded, upon which error is assigned, and the same issue

is still before this court.    The defendant in error has had his day in the
court below, and now has his day in this court.    It is *now* the demand of
the plaintiff in error that we pass upon the sufficiency of the defence to his
action in the court below.    That defence was rested upon the lien created
by the By-law, and the existence of that lien depends upon the legality of
the By-law.    The court below (a court of law) is the only tribunal before
which that issue could be made.    Certainly the only tribunal to which the
plaintiff in error could resort, for the purpose of testing the By-law of the
company, was that to which he did resort, and the action which he
brought, the proper process.    He could not go into a court of equity, be-
cause of the remedy open to him at law.    This was fully settled by Lord
Mansfield, in 2 Burrows, 780, also by Lord Eldon in 17 Vesey, 327.    The
latter is the case of Adley, complainant, *vs.* The Whitstable Company.
This was a company incorporated by act of Parliament for the purpose of
dredging for oysters.    According to a By-law, any freeman of the com-
pany who should send oysters to market, from any oyster grounds other
than the oyster grounds of the company, should forfeit ten pounds, for the
use of the company, and if he refused to pay the forfeiture, he should
thenceforth be excluded from all share in the profits to be thereafter real-
ized.    The complainant becoming obnoxious to the penalty, and also to
the disfranchisement, filed his bill, insisting that the By-law was invalid,
and demanding that the company account with him for his share of the
profits.    The Chancellor held that if the By-law was pronounced by a
court of law invalid, he would hold the defendants to account, but not until
then.    " Upon these grounds," said Lord Eldon, " unless I can be satisfied
that the party has such a remedy at law as ought to bar his application to a
court of equity, I conceive he has a right to apply here for such relief, as
under all the circumstances he is entitled to, *provided these By-laws are
not valid*, a question which I am unwilling to prejudice, by expressing any
opinion upon it; but if a court of law will inform me that this is not a good
By-law, even on the state of this record, I shall find means of giving to
the plaintiff the benefit resulting from his title in this concern if not for-
feited at law under the By-law.    The mode of trying that question ap-
pears to me to be *an action*, unless some more convenient course can be
suggested."    The course indicated by Lord Eldon is precisely that taken
by the plaintiff in error—an action against that officer of the company,
whose duty it is, under the charter, to make transfer of the stock.    In the
case decided by Lord Eldon, the action, he thought, ought to be against
that officer, charged with the payment of the profits of the company.
This authority I refer to for the purpose of proving that the validity of the
By-law is properly before this court, and that by the pleadings the ulti-
mate question, upon which the rights of these parties turn, is its validity.

   Before entering upon the discussion of the prime question thus brought
before us, a few preliminary facts and principles may, with propriety, be
stated.    The objects contemplated in the charter of the Augusta Insurance
and Banking Company are two-fold, to wit : Insurance and banking.—
Prin. Dig. 81, 6th and 10th section of the charter.    The power of general
insurance and banking conferred upon the same company, I will not say
is extraordinary in our State, but certainly a very broad grant ; the exer-
cise of which should be held strictly within the authority of the charter.
By the third section of the charter, the stockholders, among other things,

are clothed with power " to make, ordain, and establish such By-laws, rules and regulations, as they may deem expedient and necessary to carry into effect the objects of the institution, provided such By-laws, rules and regulations, be not repugnant to the laws or constitution of this State or the United States." It is under this clause that the right to make the By-law in question, and before recited, is claimed by the defendant in error.

In relation to private corporations, I remark, they are *limited strictly* to the exercise of those powers which are specifically conferred. The exercise of corporate franchises, being restrictive of individual right, cannot be extended beyond the letter and spirit of the act of incorporation.—4 *Peters*, 168. They can take nothing by implication. When they claim a power, they must show the authority, either in the letter or conclusively ascertained spirit of their charter. And when the exercise of a power and the right of a citizen come in conflict, and the power is doubtful, courts of justice will lean towards the citizen ; for sound and sufficient reason—because all corporate powers are in derogation of common right.

This rule is not too stringent ; and its equity and policy will be seen at once, by reference to the vast monitary and commercial advantages, which combined capital, associated mind, and concentrated effort, give to the corporation over the citizen.

The common law is jealous of corporate powers. In England, these bodies are held to their charters with unswerving rigidity and ceaseless vigilance. In this country the rule had better be narrowed than enlarged. Whilst I would in no case interfere with the vested rights or conceded franchises of a corporation, no matter how numerous those rights, or how unequal and unjust those franchises, because I believe that all the interests of society would be involved in inextricable embarrassment by such interference ; yet, at the same time, I am satisfied that the safety of those interests demands that courts of justice see to it that the rights and franchises claimed are in fact within the grant from the Legislature. The claim of power here is to make a by-law, which creates a lien in derogation, as I believe, of common right. Now, how far has the Legislature conferred upon the Augusta Insurance and Banking Company such a power ? It is not contended that the power to create such a lien is expressly given in the charter ; if it were so given, the question would be at rest. It is contended that the power is conferred in the grant of power to make by-laws. Now, I hold that this company has under its charter no more power to make by-laws than it would have had without the provision in the charter in relation to them ; and farther, that this company has under its charter no more powers to make by-laws than any association of individuals, for commercial or other objects, would have at common law. A power to make by-laws is incident to corporations without any grant.— *Bacon's Abridgment, Title Corporation, D.* Now, what is the restriction imposed at common law upon the power thus incident to corporations ? They may make such by-laws as are consistent with their charter, and not repugnant to the laws of the land, and none other.—*Bacon's Abridgment, Title By-Laws, E.* Lord Bacon asserts that it is of the nature and essence of a by-law not to be in contradiction to the laws of the land, " which," says he, " though it may be *præter* the general law of the realm, it cannot be *contra.*" By adverting to the restrictions upon the power of

this company to make by-laws, it will be seen that they are just such as the common law imposes. The power to make by-laws is limited to such as "are not repugnant to the laws or constitution of this State or the United States"—in other words, such as are not repugnant to the laws of this realm, the fundamental law, the statute law, and the common law. This corporation stands here, then, just as it would stand in England under the common law; and just as it would stand in this country, without any enactment as to the power to make by-laws. The power of legislating in subordination to the laws of the land, to effect a lawful object, as between themselves, is incident to all associations. The only object which the Legislature could have had in saying anything at all about by-laws in this charter, must have been this; that is, inasmuch as corporations are not creatures of the common law, but exist in this country only by Act of the Legislature, and in England only by Act of Parliament or Letters Patent, to place this corporation, so far as concerns its by-laws, upon the same footing with private associations at common law. It was urged by counsel for defendant in error that the charter extending the power to such by-laws, &c., as the stockholders may deem expedient and necessary to carry into effect the objects of the institution, legalizes all by-laws which they, in their view of what is expedient and necessary, might enact. The answer to this argument is, first, the by-law must not only be expedient, but it must be *necessary*. And is such security for the debts of this company as the by-law provides *necessary* to the object either of insurance or banking? The company might well take risks, and discount paper, without such security. If, indeed, such a by-law is sustained upon the score of its necessity, then, upon the same principle, by-laws which, in their march, tread down all the rights of the citizen, may be sustained. I apprehend that this clause of the charter is to be considered rather as descriptive of the objects about which the company may legislate, than as defining the extent of the legislative power. But, secondly, this clause is certainly subordinate to the proviso of the Act, whose object is to define and limit the power of making by-laws. This proviso is not consistent with that clause, as construed by counsel for defendant in error, but it is consistent with the meaning I put upon it. And in the construction of statutes, it is the duty of the court, if possible, to give effect to all their provisions. I have already stated that the title of the plaintiff in error to the stock of Glendenning is derived under a judgment against him—the stock being brought to sale under the provisions of the Act of 1822, "Entitled an Act to make bank, and other stock, liable to execution." It becomes necessary to look more closely to that Act, in order to exhibit the character of the lien of the judgment, and the rights of the purchaser claiming under it, as contrasted with the lien of the by-law. The first section declares that shares or stock owned by any person in any of the banks, or other corporations, in this State, shall be subject to be sold by the sheriff, or his deputy, under execution. The 2d and 3d sections prescribe the manner of the sale. The 4th section requires the sheriff to give to the purchaser a certificate of the sale. The 5th section makes it the duty of the officer of the bank, whose business it is to make tranfers of stock on the books of the bank, or other corporation, upon presentation of the certificate of sale, to make a transfer of the stock sold to the purchaser.

Section 6 makes all transfers of stock, by the owner, after judgment

obtained void, provided notice of the obtainment of the judgment is served on the proper officer of the bank or other corporation. The last section may be dismissed here, as it is considered as having no relevancy to the cause. Before the passage of this Act, bank stock was not liable to levy and sale. Creditors of stock owners were compelled to go into Courts of Equity, to subject the stock, in which court all counter-claims to, and liens upon, it were cognizable. Now it is placed upon the same footing with any other personal property. The Act of 1822 recognizes the owner as holding the entire title, and recognizes the stock, in the hands of the owner, like his slaves, as " prima facie" disencumbered of liens. It directs a sale, and by necessary implication, gives to the purchaser the absolute title, which title, like any other, is liable to be contested by any lien valid in law, and paramount to the lien of the judgment. The Act farther gives to the purchaser the means of procuring the evidence of his title, to wit, a transfer on the books of the company. It commands the bank to make the transfer. The sovereignty of the State speaks in her law, and obedience must follow, unless the bank can show, upon the authority of the same sovereignty, cause for her disobedience. The onus of setting aside the purchaser's title is cast by the law upon the bank. In the cause at this bar, she has taken that onus ; first, by refusing to make the transfer, and secondly, by her plea to the plaintiff's action. The lien of the judgment attaches the moment it is open, and binds all the property of the defendant from that time.— Prin. Dig. 426, 452. At the time the plaintiff's judgment was rendered, therefore, it created a lien upon all the property which Glendenning held in this stock. It is impossible to escape from the conclusion, that the legislature designed to put bank stock upon the same footing with other personalty. It is true that the purchaser at sheriff's sale gets the title of the defendant, and no more. In this case, what title had the defendant in the stock, at the time judgment was rendered against him ? I have shown the entire title, by the Act of 1822, until that title is weakened by a valid lien, or claim, as in any other case of property bought at Sheriff's sale. Now, in opposition to the purchaser's title thus acquired, and as a defence to his action, to make that title available, the defendant sets up what he claims to be an older and valid lien, and asks the decision of the court upon the validity of that lien. What, then, is the issue made ? Is it not manifestly an issue made between the lien of the judgment and the lien set up in defence ? If the By-law and the lien which it creates are valid, then Glendenning held only the legal estate in the stock encumbered with the lien, and Tuttle got that legal estate and no more. But if the By-law be invalid for any cause, and the lien be in consequence void, as against the judgment lien, then Glendenning held the whole property in the stock, and the purchaser, Tuttle, acquired that and no less. These considerations demonstrate that this is no contest between Tuttle merely, as a volunteer purchaser with notice, and the bank. If that were the contest, it would even then be a serious question, under the law and facts of this case, whether he did not acquire a perfect title. But it is not. It is a contest between the judgment lien of a creditor, and the lien set up by the bank, predicated on the By-law, and that lien, as I have before said, depends upon the validity of that By-law. The notice at the sale can avail the bank nothing. If the lien, of

which she then for the first time gave notice, be invalid, it cannot be helped by the notice. If the By-law be bad, it is bad *ab initio*, and is as though it had never been. If it be bad, then the rights of these parties are as though it had never been. This decision, as to its legality, goes back to the first moment of its adoption, and in its return covers and protects all rights which are sought to be affected by it. If the court is called upon to pronounce upon its validity, then I submit whether these conclusions are not irresistible; and that it is so called upon both parties admit—by which I mean to say, that it is not only admitted by counsel in argument, but it is admitted by the pleadings. "Pleading is the formal mode of alleging, on the record, that which would be the support or defence of the party in evidence."—By Buller J. 3 T. R. 159. I proceed to inquire, having thus defined the position of the question, what kind of lien, if any, is created by this By-law? Liens are either general or particular. A general lien is the right to retain the property of another for a general balance of accounts. A particular lien is the right to retain it, only for a charge on account of labor employed, or expenses bestowed, upon the identical property detained. The latter kind of lien is favored in law, but the former taken most strictly against the party setting it up. —2 Kent. 634; 3 Bos. and Pul. 496; 4 Burrows 2221. These liens are created either by common law, or by usage of trade, or by express agreement of the parties.—4 Burrows, 2221. A lien upon the shares of a stockholder for debts due by him to a corporation, does not exist at common law, nor by usage of trade. When it does exist, it is usually given by statute.—Ang. and Ames, 296. The lien, therefore, of the Augusta Insurance and Banking Company, if it has any at all, which I may once for all deny, is a general lien, created by an implied contract between that Institution and Glendenning. The evidence of this contract is found in the By-law, and in the fact that Glendenning took the stock upon the terms prescribed in it. The parties have in this contract themselves declared what kind of lien the bank is to have. And first, it is declared that the stockholder, (Glendenning,) who may be indebted to the institution, as payer or endorser, upon any note or notes, lying over and dishonored, shall not be permitted to transfer his stock; and second, in that case the company shall be considered a creditor in possession, and such possession, and such dishonored note or notes, shall constitute a lien upon the stock, which shall be held subject to the payment of such note or notes.

The lien, then, by the agreement, is that of a *creditor* in *possession* for a balance of accounts. Again then, our inquiry returns, Have these parties the right at common law, to create such a lien, through the agency of a By-law, thereby excluding creditors, without notice, and purchasers who claim under the lien of their judgments? Is the By-law good or bad, at common law? If it is bad, then there is no agreement, and no lien. I now return, I trust, with a clearer view of the whole ground, to my primary threefold division of the question made by the record; and first, is the By-law valid as between Glendenning and the company, the original parties? It may be conceded that it is. I can see no good reason, why this company may not prescribe terms to the tenure of their stock, so long as the terms prescribed affect no rights but those of the company and the stockholder. Viewed in the light of

an agreement between the parties, it is good.   As between the original parties, the question of lien does not and cannot arise.   As the evidence of an agreement between the parties, the By-law is one thing; as the act of the bank, which is the foundation and proof of a lien, it is a very different thing.   It may be good for one purpose, and bad for another.   It may restrain the voluntary transfer of the stock, and it may appropriate the dividends, and apply the stock itself, to the extinguishment of the stockholder's indebtedness, so long as such appropriation and application do not interfere with the rights of third persons.   Thus far, it may be considered as not against the laws of the Realm, as not repugnant to the constitution and laws of the State and of the United States.   This position is sustained by authority.—Ang. and Ames 297 ; 1 Harrington's Del. Rep. 27 ; 2 Peere Williams 207.   It is true, too, that such a By-law as this has been sustained as between the assignees in bankruptcy of the stockholder, and the corporation.   It was so adjudged in the case of 2 Peere Williams.   This, however, settles nothing as to the rights of third persons, because the assignees of the bankrupt stockholder occupy his place—are subrogated to his rights, and are subject to his contract with the company.   They pay no value—are not creditors or purchasers. The question of lien does not arise.   In case of the bankruptcy of the stockholder, the question of lien might be made, perhaps, as against both the company and the assignees, by one or more of the creditors. Secondly, Is the by-law valid as between the company and the creditors of Glendenning?   In my judgment it is not, and according to the views already given of the character of this issue and circumstances of this cause, it is equally invalid as against a purchaser, who claims, under a creditor's judgment open against Glendenning—that is to say, the lien set up by the bank is not good against the lien of that judgment.   I come now to consider, it will be perceived, the By-law as the basis and proof of lien.   And before proceeding farther, I remark, that the authorities read by the learned counsel for the defendant in error, do not make this By-law good as between the bank and third persons.   In no case read by him, was the contest between the corporation and the creditors of the stockholder.   The case read from Peere Williams, which was relied upon with greatest confidence, as I have before stated, was a case between the assignees of a bankrupt stockholder and the corporation. That case was decided, moreover, upon the express ground that the legal interest in all the stock was in the company, who were trustees for all the members.   Angell and Ames, commenting upon this case, state this to be the ground of the decision.   The Chancellor in delivering the opinion of the court says, " This is a good By-law, for the legal interest in all the stock is in the company, &c."   The By-law in the case in Peere Williams, was substantially the same with that in this case.   Now, so far from the legal interest in the stock of the Augusta Insurance and Banking Company being in the company, that interest is in the stockholder, and the company are in the character of trustees of the fund paid for it, to be used by them as such for his benefit.   The stock stands in his name on the books of the company.   This case cannot therefore negative the position which I last assumed.

To make this by-law, and the lien created by it good, notice of the law to the world, and in this case notice to Tuttle, at the time he gave

credit to Glendenning, was indispensable.   Without such notice it is a
fraud upon creditors, and void.   It is not pretended that there was
notice, either actual or constructive.   If there had been notice, I do
not hesitate to say, that much of the difficulty of this question would
be removed.   There was no notice.   The lien is secret, and this is the
radical vice of the whole transaction.   For the purpose of encouraging
trade, commerce, and the arts, particular liens, such as the liens of arti-
sans, factors, bailiffs, consignees, &c., are favorably regarded by the law,
and though secret, are protected.   Not so with general liens created by
contract.   The law does in fact abhor a general secret lien; and to be
sustained, it must be founded in the clearest and strongest equity.
Modern decisions lean against them.   The vendor's lien for the pur-
chase money of real estate, founded in that clear principle of equity,
that the vendor is entitled to a just equivalent for his property, is not
much favored in the late cases, because it is a secret lien.   It has
been determined by the Supreme Court of the United States, that the
vendor's lien cannot be retained against creditors holding under a *bona
fide* mortgage, or conveyance from the vendee, nor against a subsequent
purchaser without notice.—7 Wheat. Rep. 46 ; 3 Gill & Johns. 425 ; 5
Yerger, 205 ; 4 Kent, 154.
  Chancellor Kent, commenting upon this decision, uses this strong lan-
guage—" As the *registry of deeds* is the *policy and practice in this country*,
I think the decision in Wheaton is correct, and that this *latent equitable
lien ought not to prevail* over bona fide purchasers from the vendee, and
for valuable consideration, and that they *are not bound to take any notice*
of this dormant lien, resting, for its validity, on the state of the accounts
between the vendor and his vendee."—4 Kent, 154. n.   The opinion
is strongly intimated, in this quotation, that the purchaser's title would be
good against the vender's lien, even with notice.   With what force does
not this reasoning apply to the case before this court ?   Is the lien claimed
by the defendant in error within the policy of the rule which recognizes
particular liens at Common Law, or the equity of that which allows the
vendor's lien ?   I hope to be able to show that it is not.   I say this is a
secret lien.   How stand the facts ?   This corporation declare, by a by-
law, that they are creditors in possession of Glendenning's stock, and *that*
possession, with a future indebtedness, if perchance he may become in-
debted, shall constitute a lien in their favor.   The law is recorded on the
books of the company, which books are not open to the inspection of the
world, but are carefully hid away in its vaults.   There is no publication
of it, nor is there any notice of Glendenning's indebtedness.   That too
is, until long after Tuttle has given him credit, a profound secret.   Having
legislated themselves into a right adverse to all the world, it is not until
Tuttle has become the creditor of Glendenning, and reduced his debt to a
judgment, and brought the stock to sale, that they make a revelation of
that right.   They occupy a position wholly anomalous.   They are, in a
land of laws, the legislators and administrators of justice.   Their by-law
and their possession is their lien ; and at the same time a judgment to
which the general administration must yield obedience.   Not only is this
true, but whilst it is true, they *do give notice*, semi-annually, that Glen-
denning is, in fact, the *owner* of the very stock upon which they claim a
lien.   Not the holder of the legal estate encumbered with their equity

but the unqualified owner.—Hotchkiss, 360.    That this notice is a requirement of law does not relieve them.    Being required to report the names of their stockholders, and the amount of stock owned by each, should, and does constitute a reason why, in good faith to the public, they should give notice also of the encumbrance upon it.    Nor is it any answer to say that such publication would be impolitic as to the interest of the bank.    As a bank, the law recognizes, in their behalf, no favors nor exemptions but such as are found in their charter.    It is a strong legal presumption that it was upon the faith of the ownership of this stock, thus made known, that Tuttle gave credit to Glendenning.    *The by-law is therefore a fraud in law upon creditors and purchasers, and void.*    I do not mean to say that notice is indispensable to all liens, but that in the circumstances of *this case*, notice is indispensable, and the want of it a fraud upon strangers to the corporation.    If it be in law fraudulent, it is repugnant to common right and common law, and of necessity void ; and in no stage of these proceedings entitled to the sustaining consideration of courts of justice.

But this by-law, in its terms, creates the lien of a *creditor in possession*, to secure a contingent indebtedness ; by which is meant, I suppose, a general balance, which at any time may be found due by the stockholder to the company.    Creditors in possession at common law have a lien, under certain circumstances.    The facts of this case do not give the company the position of creditors in possession.    The lien of creditors in possession arises in cases where property is placed in possession of an individual, or company, upon which labor or expense is to be bestowed by agreement made between the parties, or implied in law.    The depository has a lien upon it for his labor and expense.    Also, in other cases, when a contract is made or implied, that the property is to be retained to secure a present or continuously recurring indebtedness.    Now in this case, at the time of making the by-law, there is no labor to be bestowed *on*, or expense to be incurred *about*, the stock.    The lien is not claimed on account of either.    Nor is there any present indebtedness, or running account between the parties.    It is admitted, that at the time the by-law is made, and at the time Glendenning became a stockholder he owed the company nothing, nor did he become its debtor until about eighteen months afterwards.    So that the declaration in the by-law, that the company shall be a creditor in possession, does not in fact make them so.    They cannot be, by their own act, remitted to the rights of a creditor in possession.    On the contrary, the facts in the case show the by-law to be repugnant to those principles of the common law which recognize the lien of creditors in possession, and is on that account void.— See Montague on Liens, Titles—Factor, Common Carrier, Banker, Bailee, Attorneys, Ship-builders, &c.    Nor can this be looked upon as a *pledge* of the stock, which creates a lien upon it.    Pledges may create a lien to secure precedent or contemporary debts, or *existing* debts and *future* advances.    But I believe no case can be found of a lien created by pledge without any existing debt, to secure payment of a future debt, which may or may not exist.—See 2 Kent, 576–7, 583.    The same doctrine holds, as to mortgages, only with greater strictness.    There can be no mortgage without a present indebtedness, or liability on the part of the mortgagee for the mortgagor.    And although a mortgage may be

5

good for debts to be contracted as well as for debts due, yet notice of such intent between the parties, has been held necessary.—2 Johns. C. R. 309; 2 Viner's R. 52; 4 Conn. R. 158. According to the Napoleon code a conventional mortgage, (that is, a mortgage created by the act of the parties,) is not valid except so far as the sum for which it is granted is *certain and determined by the act.*—Code Napoleon, 581. No one can fail to have remarked how careful the Legislature of Georgia has always been to require notice of liens created by statute. The policy seems to have been never to create a secret lien, always to maintain the rights of the people, equal under the law. Particularly is it true, that our Legislature has *labored* to keep the rights of creditors equal. This is apparent in our stringent registry laws, Deeds, mortgages, masons' and carpenters' liens are required to be registered.—*Hotchkiss,* 420, 623–4–5. All statutory liens are made public in the publication of the law which creates them. The policy of the Legislature is in accordance with the spirit of the age and the genius of our institutions. There is no element of monopoly or favoritism in our fundamental law. Is there anything in corporations to commend them to special favor? Does any consideration of public convenience require that they should be favored? I think not. And were it necessary, this could be demonstrated. Infinitely stronger is the reasoning in favor of conferring special favors upon individuals. The course which enlightened policy suggests, is that which our legislature has taken,—a stern determination to make the laws of the State equal. Can it, therefore, be presumed that the Legislature meant to confer upon this corporation the power of creating for itself a lien which she has nowhere given to the citizen. The idea seems to me to be unreasonable. The power has been exerted in this By-law. *It is void in my judgment, because it is repugnant to the whole drift and policy of our legislation.*

If this lien is sustained, then the law invites to collusion between the company and stockholder, and patronizes immorality. I need not linger to point out how easily this collusion may be effected, how easy it would be for a dishonest debtor, by the aid of such a By-law, with the co-operation of the company, to cheat his creditors. He is not only an individual, but he is also a corporator—he is, if such a thing can be, *part* of both parties. Interested, as he is, in the corporation, the arrangement inures as well to his benefit as to the benefit of other stockholders. It increases the strength and resources of the company of which he is a member. It has been decided that the By-law of a corporation, whose charter makes the stockholders individually liable for its debts, permitting the stockholder to forfeit his stock to the company, is void, because a fraud upon his creditors. In the case now referred to, the creditors were creditors of the company, and, at the same time, in the event of its insolvency, creditors of the stockholder. The principles involved are like those involved in the case at bar. The contest was between the creditor of the stockholder, (for it was admitted that the company were insolvent,) and the company, as to the validity of a By-law which forfeited to the use of the company his stock. In this case the court declared the By-law void and inoperative, upon the ground that it was against the fundamental principles of law and equity, and legally fraudulent.—19 *Johns. Rep.* 477, 478.

By the judiciary act of 1799, all the property of a defendant against

whom verdict has been rendered, is bound from the signing of the judgment thereon.—*Hotchkiss*, 597.    By the act of 1822, bank stock is made property liable to levy and sale, and upon which a judgment lien attaches.   By the same act, the purchaser of bank stock, under that judgment, is entitled to a transfer of the stock upon the books of the Company. The law, as I have before stated, commands the transfer.    In this cause, the demand of the transfer was duly made, and the transfer duly refused on account of the by-law of the bank.    Here we have the law of 1822 requiring the transfer, and the by-law of the bank prohibiting it.    Is the by-law consistent with the act of 1822, or rather, is it not repugnant to it ?    Both cannot prevail—the two do not harmonize.    If they are not in conflict, why this case now before this court ?    If they are in conflict, which shall yield ?    Unquestionably the by-law must yield, by the very terms of limitation upon the law-making power, contained in the charter of the company.    If, at this point in the proceedings, such direct antagonism existed, does not the antagonism still exist ?    The plaintiff, *then*, was arrested in the process of asserting his rights, by the interposition of the By-law—so is he now by the defendant's plea, of the lien of the Bank founded upon the By-law.    *Then* he could not command the Judgment of a court, to settle this conflict of laws, *now* he can, and that fact constitutes all the difference.    This conflict is the more apparent in this, that the act of 1822 is anterior to the charter of the Bank.    The charter was passed in the face of the act of '22, and we must presume, with the provisions of that act in the eye of the Legislature.    And this fact makes it also easier for me to end the conflict, by sustaining the statute against the by-law.    There is therefore a special repugnance between the by-law and the act of '22, and for that reason the former is void.

It has been already stated that no case has been found, directly adjudicating the validity of such a by-law as this, as between the corporation and creditors of the stockholder, or as between the corporation and a purchaser claiming under the judgment of such a creditor.    In the absence of direct authority, a doubt expressed by learned jurists as to the validity of such a by-law, ought to be received as influential in settling the question.    Such a doubt is stated to exist, by Angell and Ames.—*Angell and Ames*, 297.

The Washington Bank was incorporated by the Legislature of Massachusetts.    This corporation made a by-law pledging the stock of every member for any and all sums of money which said member might at any time owe the bank—the same, in substance, with the by-law of the Augusta Insurance and Banking Company.    A stockholder having assigned his shares brought suit against the bank for the use of the assignees for dividends due upon the stock.    In delivering the opinion of the court, Chief Justice Parker holds this language : " We need not, in order to decide this case, go into the consideration of the validity of this by-law against any creditor of a stockholder, though it may be worth inquiry to the corporation whether such a by-law can be of any avail, except between them and the debtor.    We suspect it is a first attempt by a general declaration of this kind to give themselves a preference over other creditors, without taking the usual means of pledge or transfer of the particular stock they intend to hold."    This, to my mind, amounts to a solemn affirmation of what is put in the form of a query.    Can it be doubted what

would be the decision of this judge upon such a by-law in a case made before him ? There seems to be in the peculiar manner in which he expresses himself a conviction of the invalidity of the by-law ; also an anxiety to depart from the necessities of the case before him, so to adjudicate it.—6 *Pick.* 329. This, then, is the opinion of one of the most distinguished lawyers of New England, confirmatory of the opinion I am forced to give, and that is, that this by-law is void as against the title of the stock in the plaintiff in error—that *being void,* there is no lien created by it, and that the decision of the court below ought to be reversed.